

233 East Redwood Street
Suite 1000C
Baltimore, MD 21202

**NIETO LAW OFFICE**

O: 443.863.8189
F: 443.378.5723
cnieto@nietolawoffice.com

January 13, 2025

The Honorable James K. Bredar
United States District Court Chief Judge
District of Maryland
101 West Lombard Street
Baltimore, MD 21201

Re: *United States v. Christopher Bendann*
Criminal Case No. JKB-23-0278

Dear Judge Bredar:

On August 28, 2024, Mr. Bendann was found guilty by a jury to all counts of the Superseding Indictment. He will be present before Your Honor on January 21, 2025 at 1:00pm to receive his sentence. In anticipation of this hearing, we respectfully submit this letter to outline the reasons why we believe that concurrent sentences of in the aggregate of **twenty (20) years** are warranted in this individual case. We submit that these proposed sentences are "sufficient but not greater than necessary" to satisfy the purposes of sentencing enumerated in 18 U.S.C. § 3553(a)(2).

## INTRODUCTION

We acknowledge that our proposed recommended sentence is different than the calculated advisory guideline range. However, as this Court understands fully, the sentencing guidelines are simply advisory and are just one of the many factors for the Court to consider in fashioning an individualized sentence. In this type of case, the guidelines often provide little actual guidance to the Court regarding the determination of a sufficient, but not greater than necessary, sentence. The guidelines in this case, as currently constructed, provide an adjusted level of 43, which is a life sentence. Mr. Bendann does not warrant a life sentence for these offenses, and neither the Government nor the United States Probation Office believe that type of sentence is warranted either.

Sentencing is a difficult art, much more difficult in cases such as these, and there always exists the temptation to fall prey to a comfortable mechanical case evaluation afforded us by a matrix like the United States Sentencing Guidelines. Some courts find solace in brightline rules, as it makes the subtleties of sentencing moot,

but this Court is not one of those. As the Honorable Judge Grimm used to say, “the problem with the Guidelines is that it turns lawyers into accountants.” This Court knows it is not beholden to the guidelines, and His Honor enjoys the freedom to look beyond them. In doing so, the Court will see Christopher Kenji Bendann as a living, breathing human being, as well as review the entirety of his life’s contributions, prior to determining his fate. In other words, "fashioning a just sentence cannot be reduced to a mere arithmetical exercise and that reliance solely on numbers, quantities, offense levels, criminal history categories and matrices produces an illusory precision that obscures the fact that sentencing, in the end, must involve the exercise of judgment." *United States v. Biheri*, 356 F. Supp. 2d 589 (E.D. Va. 2005). It is this exercise of judgment that garners its strength from the factors set forth in 18 U.S.C. § 3553(a).

Mr. Bendann is a 40-year-old man who dedicated his entire life to the Gilman community. His adoptive father David “Lance” Bendann was a graduate from this prestigious school, and Mr. Bendann followed in his father’s footsteps. This community has been Christopher’s home for the entirety of his life[1]. And although not necessarily appreciated by non-native residents of Maryland, the Gilman school is considered one of the best educational institutions in the area. Members of this community proudly celebrate their Gilman acumen, as it both opens doors professionally and financially, and Mr. Bendann too is a Gilman graduate. However, in lieu of monetizing this education like so many others strive to do, Mr. Bendann was different: he only wanted to give back to this community by dedicating his adult life to teaching at this school.[2] By every account, he was an amazing teacher and well-respected by everyone he met. It is therefore all that more saddening that, based on the evidence adduced at trial, all the good Christopher Bendann achieved at that school has been forever tarnished and vilified by the conduct adduced at trial.

We respectfully submit that a sentence of 20 years is sufficient but not greater than necessary to achieve the aims of sentencing. The Government has recommended a sentence of 35 years for Mr. Bendann, which is the length of sentence often imposed for people convicted of murder or more dangerous conduct. The sentence the Government recommends is tantamount to a life sentence. It is simply a fact that inmates have shortened life expectancies. *See United States v. Taveras*, 436 F.Supp.2d 493, 500 (E.D.N.Y. 2006) (acknowledging that life expectancy within federal prison is "considerably shortened," *vacated in part on other grounds sub nom. United States v. Pepin*, 514 F.3d 193 (2d Cir. 2008)). The United States Sentencing Commission considers 470 months (37.5 years) of incarceration to be the equivalent of a *de facto* life sentence. *United States v. Nelson*, 491 F.3d 344, 349-50 (7th Cir. 2012) (citing Sourcebook of Federal Sentencing Statistics, Appendix A, at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2023/AppendixA.pdf (last visited January 10, 2025)). "This figure reflects the average life expectancy of federal defendants at the time of sentencing as determined by the United States Census Bureau." 491 F.3d at 350.

In fact, Courts routinely look to such tables and take life expectancy into account to make determinations like the one now before the court. *See, e.g., United States v. Nelson*, 491 F.3d 344, 350 (7th Cir. 2007); *United States v. Martin*, 100 F.3d 46, 47 (7th Cir. 1996) (also holding that good-time credits should not be considered by sentencing court in determining whether sentence imposed exceeded life expectancy); *People v. Rainer*, 2013 WL 1490107, *13, n. 6 (Colo. 2013) (state cert. granted Dec. 22, 2014); *State v. Null*, 836 N.W.2d 41, 71 (Iowa 2013); *People v. J.I.A.*, 127 Cal. Rptr.3d 141, 149 (2012).

---

1 Mr. Bendann is a life-long resident of Baltimore that only left the state to attend college in New York before returning four years later, before he even officially graduated college. He has no family outside of Baltimore nor any other place to call home

2 As was referenced during trial, Mr. Bendann began housesitting and babysitting for members of the Gilman community to supplement his income.

Mr. Bendann's convictions warrant a significant penalty, to be sure, but in federal court, that length of sentence is inconsistent with similar cases, and imposition of such a sentence would create an unwarranted sentencing disparity, which § 3553(a) specifically mandates against. The Court must fashion an appropriate sentence, taking into consideration all relevant § 3553(a) factors, that is no longer than necessary to further the aims of federal sentencing. Important in that calculus is the fact that Mr. Bendann has lived a life full of public service and good deeds. He has never been arrested or charged with breaking the law in any capacity throughout his life, and we submit that the criminal conduct in this case does not encapsulate the sum of his life's work. Appreciating the importance of judicial economy, Mr. Bendann would simply like to highlight some factors that are relevant in determining an appropriate sentence now, but would respectfully request the right to delve deeper into all other relevant details and arguments on the day of his sentencing if necessary.

**PRE-SENTENCE REPORT AND ADVISORY GUIDELINES**

According to the Presentence Report (PSR) prepared by USPO Manisha Garner, Mr. Bendann's advisory guideline range is Life. These numbers are based on a total offense level of forty-eight (48) and a criminal history category of I. It is the defense's position that this advisory guideline range is inaccurate., and Mr. Bendann respectfully objects to several of the proposed sentencing enhancements.

1. **USSG § 2G2.1(b)(5)**

With regards to the guidelines for the Sexual Exploitation of a Child offenses, the PSR contemplates a two-level increase to the base offense level because they incorrectly assume that the victim was under the custody, control or supervisory control of Mr. Bendann at the times the videos were created. In support, the PSR references aspects of Mr. Bendann's connection to the victim as an intermediary between school and home.[3] However, there was no evidence adduced at trial or in the Government's submissions that establishes that any of these videos were created during the time in which the victim was in the custody or care of Mr. Bendann. Indeed, the evidence from trial established that Count One and Two were created when Mr. Bendann acted as a taxi service for the victim. He was not tasked by the victim's family to do this nor was he accepting custody of the victim; this was solely part of the friendship that existed amongst members of this friend group. Indeed, Mr. Bendann did not seek out opportunities to pick up the victim from various parties late at night, but rather the victim would contact Mr. Bendann himself to ask for a ride home.

Additionally, this enhancement should not apply for the remaining counts either. In Counts Three and Four, there is no evidence that Mr. Bendann was entrusted to "serve as the guardian" for the victim when these videos were created, as the victim did not stay at these other houses during the time the videos were created nor was Mr. Bendann supervising him. And in Count Five, pertaining to a video that depicted activity at the victim's home, there was no evidence that Mr. Bendann was supervising the victim in any capacity at the time it was created. Based on the time stamp for this specific video, the victim was approximately one month away from turning 18 years old, and the testimony at trial from the victim's

3 This argument made in the PSR is almost identical to what the Government argued in their sentencing filing. It is believed that the basis for the PSR's conclusions were based solely on conversations with the Government.

parents was that they never asked Mr. Bendann to housesit or babysit the victim. Accordingly, we respectfully submit that this enhancement should not apply.

2. **USSG § 2G2.1(b)(6)(B)**

The PSR also includes a two-level enhancement because Mr. Bendann used his cell phone service and Snapchat to communicate with the victim. However, it is important to note that the sentencing guideline enhancements are designed to increase the punishment of defendants for aggravating factors in their case. For example, the guidelines in fraud cases are driven by loss amounts, which makes sense because the more money you steal, the worse your crime is. In drug cases, the quantity of drugs or criminal history serve as enhancers as well; this is predicated on the theory that selling kilograms of drugs is worse than selling grams, and having a recidivist history of breaking the law is worse than someone who is a first-time offender.

But this specific enhancement, § 2G2.1(b)(6)(B), is an antiquated and arcane enhancement that is not an aggravating factor in this case. While it may have been warranted prior to the proliferation of cell phone use throughout the world, it currently has no bearing in the modern world of technology. Counsel struggles to recall a case involving violations of 18 U.S.C. § 2251(a) that did NOT contain this enhancement because everyone in today's age communicates via interactive computer services.[4] Notwithstanding this reality, Congress has not endeavored to either revisit this enhancement to determine its applicability in the 21st century or simply change the base offense level for these offenses by adding two levels and removing this enhancement entirely. Accordingly, we respectfully request that the Court not apply this enhancement as its application results in an offense level that overrepresents the conduct in this case.

Consequently, Mr. Bendann submits that the appropriate adjusted offense level for Counts 1 through 5 should be thirty-four (34) in lieu of the proposed thirty-eight (38).

3. **USSG § 2G2.2(b)(7)(D) and USSG § 4B1.5(b)(1)**

With regards to the Possession of Child Pornography charges, Counts 6-8, the PSR applies a five level increase because the defendant engaged in a pattern of activity involving the sexual abuse of a minor. This sizeable increase to the guidelines is then increased again with another additional 5 levels due to a multiple count adjustment for the same pattern of conduct. Then, via the Chapter Four enhancement for engaging a pattern of activity involving prohibited sexual conduct, the guidelines are increased a third time with another five levels.

The applicable guidelines in this case are increased two- or three-fold for the precise same conduct, and this creates an impermissible number of enhancements that render these guidelines arbitrary and capricious. As the Court knows, in cases involving drug distribution, gun possession and the customary § 924(c) charge, the guidelines do not add a 5-level enhancement to the drug guidelines for possessing a gun during the commission of the crime; that aggravating aspect of the crime is already addressed by the other charge. However, in child pornography cases, the guidelines are absolutely unforgiving and

4 Interestingly, this same type of enhancement is applied in the guideline computation for the Possession of Child Pornography counts. Specifically, there is a two-level increase because Mr. Bendann was adjudged to have used a computer to possess and access the imagery.

draconian in their computation, and they do not provide any consideration for the duplicative punishments inherent in these calculations.

If the guidelines were computed without the duplicative 5-level increases and 2-level increases for use of a computer device, they would provide this Court with some true guidance as to an appropriate sentence. Indeed, with adjusted offense levels of 34, 27 and 20, the advisory guideline range would be 38, with a suggested 235-293 months. That range is fully in-line with our requested sentence of 240 months.

Consequently, Mr. Bendann objects to these various sentencing enhancements and respectfully submits that they should not apply to his guideline computation.

**RELEVANT § 3553A FACTORS TO CONSIDER**

**1. PERSONAL HISTORY AND CHARACTERISTICS OF CHRISTOPHER BENDANN**

As indicated earlier, Christopher Bendann was raised in Baltimore by his two loving parents, Lance and Annie. He was born in Seoul, South Korea and was adopted by the Bendanns when he was less than 6 months old. Growing up, Mr. Bendann was told he was adopted because his father, a married Japanese man, wanted nothing to do with the child he created with a South Korean woman out of wedlock. Although raised in a loving household, Mr. Bendann never really felt a part of his new community. Being Asian-American in an environment where there were not many other South Koreans with whom he could connect, Mr. Bendann struggled with that adjustment into this community. He looked different, he felt different and he knew he was different.

With children, being popular or liked by your peers can seem to be the most important aspect of their lives; it is very important to most children to have friends and to fit-in as they develop their identities. Mr. Bendann suffered from social ostracization when he was young. Indeed, one of Mr. Bendann's most salient memories as a child was when he asked a girl on a date, and she rejected him solely because he was Asian. An interaction like that, at such a young age, has lasting effects, and that one interaction summed up all of Mr. Bendann's fears and confirmed them to be a reality: he was different and felt alone.

Notwithstanding his being a stranger in a strange land, the Bendann family was a Gilman family. The Bendanns were deeply involved in that community and saw the value in that education and community. Gilman looks after their own, and if a young man were lucky enough to be admitted to this school, a myriad of previously-closed doors would be open to him. Accordingly, Mr. Bendann attended Gilman just as his father had done before him. He did well during his time at this school with regards to his grades, but as he got older, he struggled with the toxic masculinity that permeated the student body that did not fit in with his own worldview and lived experiences.

Despite these adolescent issues, Mr. Bendann very much enjoyed the Gilman community. His father was actively involved, the teachers at the school were interactive and spent time with each student, and there were always Gilman-related events to attend. Despite feeling like an outsider, this was the only community he knew. Additionally, Mr. Bendann was also extremely close with his mother; she treated him like she was her biological son, and he craved her attention[5].

5 Mr. Bendann's origin story, in essence, is that he was a mistake, and that his biological father was ashamed of him. Counsel imagines that this may have contributed to Mr. Bendann's feeling of isolation and his craving for approval.

After graduation, Mr. Bendann matriculated to Skidmore College in New York. It was there that he truly began to appreciate how special his Baltimore/Gilman community was. He was now interacting with people from outside Gilman, and he did not connect very much or adjust well with the other members of the student body. To be sure, he was friends with some female roommates during his junior and senior year, but he found that he did not really acclimate with the college guys on campus. They were different from that to which what he was accustomed, and his college experience suffered from this lack of friendships throughout college.

After four years at college, he returned home to start teaching at Gilman. He had not yet technically graduated because he had not completed his senior thesis, but the Gilman school employed him and allowed him to work on his eventual graduation. Mr. Bendann was appreciative of their willingness to work with him and felt that this was a good example of what he was missing: support and care.

Mr. Bendann threw himself into his work. The Gilman community became almost the entirety of his life. In addition to teaching students, he made sure he was active in other aspects of the school. He was the middle school coordinator and served on the school alumni board. He won an Advisor award in 2018 and 2019 and headed up the mentoring program at the school. He was dedicated to making Gilman as great as it could be, and he was succeeding. He was adored and revered by the student body, and he was well-respected by the teachers and parents alike. *See Exhibit 1a-1d: Student Notes to Mr. Bendann*.

Things changed for Mr. Bendann when his beloved mother was suddenly diagnosed with pancreatic cancer in November of 2012. Christopher was 28 years old. Due to the aggressive and fatal nature of this specific cancer, she passed away less than two months later. Such a sudden, tragic death of his ever-supporting and loving mother was crippling to Mr. Bendann. His biggest supporter and friend was gone, and Mr. Bendann began to feel alone all over again.

Mr. Bendann could not regroup after the passing of his mother. He had struggled with isolation for most of his life and now his pillar of strength was gone. He missed her love and affection tremendously and sought out something similar outside of his family. Due to his dedication to his job, the only places to seek this missing component of his life was from the Gilman community. It was the only place he knew to find solace. This need for acceptance led Mr. Bendann to misinterpret his mentorship of students as more serious friendships and relationships. We submit that this facet of his life contributed to the arrest and conviction for the conduct alleged in this case.

## 2. UNWARRANTED SENTENCING DISPARITIES

Pursuant to 18 U.S.C. §3553(a)(6), one of the aims at sentencing is to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. Indeed, there have been a few teacher-student related child pornography cases prosecuted in this federal court, and the sentences imposed were less than what the Government is recommending for Mr. Bendann:

*United States v. Evan Thomas Harris Frock*, BAH-22-0373: In this case, the defendant received a 17-year sentence for sexual exploitation of a child. He was a Carroll County substitute teacher and volleyball coach. From 2021 through May 2022, he pretended to be a minor on social media. There were 8 minor victims, ages 9-17 years, who he had send him nudes and in one instance distributed one of the minors' nudes to other minors to coerce them to send him nudes. In addition to these text messages, there were images of child

sexual abuse material found on his devices, including toddlers, violence, and bestiality.

*United States v. Lewis Ismael Blandon*, MJM- 21-428: Mr. Blandon was a middle school music teacher in Baltimore City with no prior convictions. He began exploiting children in 2002 when he started grooming a minor victim, who was just 12 years old when the grooming began and he began sexually abusing him for years. They began by playing video games together, then Mr. Blandon began showing him pornography, began masturbating in front of him and encouraging him to do the same. Finally, he began touching the minor victim and engaging in sex acts with him. It came to the point where anytime the minor victim was with Mr. Blandon, he was expected to engage in sexual acts. Further, Mr. Blandon specifically sought out minor victims online, sharing links to child pornography that showed pre-pubescent children being raped, ball gagged and restrained. He coerced naked pictures and engaged in explicit conversations with these boys. He engaged in sex acts with another minor victim in Maryland and even traveled to New Jersey to meet another minor and engage in sex acts. The defendant also had engaged in hands on abuse with his younger cousin 20 years prior. Government counsel requested a sentence of 25 years, and the Honorable Judge Maddox imposed a 19-year sentence.

*United States v. Kenneth Brian Fisher*, RDB-18-0100: Mr. Fisher was a Carroll County teacher who was caught in a sting operation planning to meet a 14-year-old to engage in sex acts. He sent 4 pictures of his erect penis and admitted to having sexual contact with minors for 5 years and exchanging sexually explicit material. He started meeting underage males in 2013 or 2014 and used the internet to engage with approximately 7 minors in sexual acts. He even met a 14-year-old from Pennsylvania, traveled to him and engaged in anal sex before videotaping them masturbating each other. He received a 22-year sentence.

a. **United States vs. Davante Harrison, JKB-22-0439**

Additionally, this Court presided over the case involving Davante Harrison aka "YGG Tay." Undersigned counsel is familiar with this individual because his name emerged during the 2018 prosecution of Montana Baronnette and the enterprise "TTG." During that case, it was established that YGG Tay was the financier for murders throughout Baltimore for years. Indeed, he was responsible for financing many of Barronette's murders and even murdered a cooperating federal informant.[6] He was unapologetic about his actions and made the bulk of his money from music and drug dealing. His songs glorified his conduct and showed a complete lack of remorse. Eventually, he was prosecuted for drug distribution and gun possession and went to trial. He was convicted and received 180 months.[7] While serving that sentence, he was federally indicted again, this time in a RICO prosecution, case no. JKB-22-0439, involving a slew of murders. It was established that after Barronette was arrested and convicted, YGG Tay no longer had someone who would kill people at his behest. He then reached out to David Warren to fill this void in 2018, bragging at one point on Instagram that he had "just signed the top shooter in the city to a deal." For this conduct, YGG Tay received a sentence of 25 years, concurrent to his existing 15-year sentence that he was already serving.[8] While there is no doubt that the conduct for which Mr. Bendann was convicted was serious, there can be equally little doubt that Mr. Bendann merits a sentence more than that received by the murderous YGG Tay.[9]

---

6 https://www.baltimoresun.com/2018/09/18/feds-tell-judge-baltimore-rapper-ygg-tay-offered-20000-bounty-on-witness-but-he-hasnt-been-charged/

7 https://www.justice.gov/usao-md/pr/davante-harrison-ygg-tay-sentenced-15-years-federal-prison-drug-conspiracy-and-related

8 Interestingly, the statement of facts for David Warren's plea contains a myriad of additional criminal conduct that YGG Tay committed. Although not included in YGG Tay's plea agreement, Warren's fact pattern includes additional murder-for-hires that the Government knew YGG Tay financed. *See Exhibit 2: David Warren Statement of Facts.* YGG Tay is "Co-Conspirator 3".

9 Moreover, according to the Bureau of Prisons, YGG Tay is currently ten years younger than Mr. Bendann and thus will be released

**CONCLUSION**

On behalf of Mr. Bendann, we respectfully request the imposition of a 240-month sentence as sufficient but not greater than necessary to further the aims of federal sentencing. We respectfully submit that this is a sufficient, but not greater than necessary, sentence that encapsulates the convicted conduct while taking into consideration the relevant §3553(a) factors.

In this specific case, it is the defense's position that the guidelines provide no true guidance to the Court in fashioning an appropriate sentence. As indicated earlier, neither the United States Probation Office nor the United States Attorney's Office are requesting a guideline sentence, and we have endeavored to outline the arithmetical and antiquated aspects of these guidelines in support of our request. We submit that although the conduct for which Mr. Bendann was convicted was horrible and a lengthy sentence is appropriate, the Government's and Probation's recommendations do not take into consideration all the relevant 3553(a) factors.

Mr. Bendann is 40-years old and has never known anywhere other than Baltimore as his home. Due to this conviction, and associated publicity, he can never return to Baltimore and expect to live a normal life ever. His father is approximately 78-years old and is the only real family member that Christopher has. Upon the completion of this sentence, it is unknown how healthy his father will be or whether he will even live into his late 90s. In fact, sadly, it is highly probable that Mr. Bendann will be alone in this world when released, just as he always feared we would be since he was a child. He has lost everything he struggled so hard to earn and maintain both professionally and personally.

Additionally, due to these offenses, every single student with whom Mr. Bendann interacted and helped now believes that this attention was simply to groom and assault them too. Nothing could be further from the truth, but that is the prevailing sentiment within the Gilman community. As an educator and mentor, one who took those responsibilities seriously, the fact that students would feel like they were a target is devastating to him. The name Bendann, a name that precedes Christopher by generations of quality men, will forever be tarnished as reminder of this horrible chapter at the Gilman school. This reality, one that affects not only him but his father's legacy, is a significant part of Mr. Bendann's punishment. It is one that cannot ever be lessened.

Respectfully, the proposed sentence of 240 months will do as much, if not more, to "protect the public from future crimes of the defendant" than a lengthier sentence of incarceration would. Primarily, Mr. Bendann is almost 41 years old. With the imposition of this proposed sentence, one for which he will serve a minimum of 85%, it is unlikely that he will be released until he is almost 60. Aging is associated with decreased criminal behavior, and sexual offenses are no exception to that association. The mitigating effect of aging for sexual recidivism has been studied for decades and, in a large multi-state study, individuals with a history of sexual offending released over the age of 60 had a recidivism rate of just 3.8%, whereas the overall rate across all age bands was 17.5%[10]. Indeed, there seems to be a consensus

---

at a much younger age. By the same token, he will face much less onerous forms of supervised release as he will not be subject to SORNA requirements.

10 https://www.researchgate.net/publication/347110032_Are_Civilly_Detained_and_Committed_Sexually_Violent_Persons_Released_After_Age_60_Low_Risk

that recividism drops after the age of 60. Consequently, the relevance of an individual's age at release has been emphasized in actuarial assessments of sexual reoffense risk.

Mr. Bendann will also be on federal supervision at the conclusion of his sentence. With the mandatory, standard, and proposed conditions of supervision, there will be additional safeguards to prevent any illegalities from occurring for the remainder of Mr. Bendann's life. His internet access would be curtailed and monitored, thereby assuaging all the Court's concerns about potential communications. He will have to register, both federally and locally, in whatever state he resides; he will never be able to shirk the stigma associated with this case. We submit that these factors should provide the Court with additional assurances that a lengthier prison sentence is not necessary to address the relevant 3553(a) factors pertaining to this crime.

Based on these arguments, and additional arguments to be made at the time of the hearing, we submit that the proposed sentence is sufficient but not longer than necessary sentence to further the aims of 3553(a). In anticipation of the sentencing hearing, we wish to advise the Court that Mr. Bendann's father may wish to address the Court directly prior to the imposition of sentence in this matter. There are other friends and family members who wish to provide additional information regarding Mr. Bendann but cannot attend this proceeding in person. Accordingly, we also submit various character letters from them to provide the Court with additional information about who he really is. *See Exhibit 3: Character Letters.*

Sincerely,

________/s/____________________

Christopher C. Nieto, Esq.
Nieto Law Office
233 E. Redwood Street, Suite 1000C
Baltimore, MD 21202
(443) 863-8189 Office
(443) 378-5723 Fax
cnieto@nietolawoffice.com

CC: AUSAs Colleen McGuinn and Kim Hagan
USPO Manisha Garner

EXHIBITS:

1. Notes/Messages from students to Mr. Bendann during his time at the Gilman school
2. Statement of Facts from David Warren's plea agreement in JKB-22-0439
3. Character Letters from friends and family