1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MARYLAND
2                  NORTHERN DIVISION

3    UNITED STATES OF AMERICA,   )
                                 )
4              vs.               )    CRIMINAL CASE NO.
                                 )    1:23-cr-00278-JKB
5    CHRISTOPHER KENJI BENDANN,  )
                Defendant.       )
6    _____ )

7                    THURSDAY, MAY 9, 2024
                      Courtroom 5A
8                  Baltimore, Maryland

9               TRANSCRIPT OF PROCEEDINGS
                   MOTIONS HEARING
10        BEFORE THE HONORABLE JAMES K. BREDAR

11

      For the Government:
12
      Colleen E. McGuinn, Esquire
13    Kim Y. Hagan, Esquire
       US Attorney's Office
14     36 South Charles Street, 4th Floor
       Baltimore, MD 21201
15

16    For the Defendant:

17    Christopher Nieto, Esquire
      Gary E. Proctor, Esquire
18     233 East Redwood Street, Suite 1000c
       Baltimore, MD 21202
19

20    Also Present:

21    Rachel Corn, FBI Special Agent
      Callista Walker, FBI Special Agent
22    _____
          (Computer-aided Transcription of Stenotype Notes)
23
              Reported by: Amanda L. Longmore, RPR, FCRR
24              Federal Official Court Reporter
                101 W. Lombard Street, 4th Floor
25              Baltimore, Maryland  21201
                      410-962-4474

1                          I N D E X
              UNITED STATES v. CHRISTOPHER KENJI BENDANN
2                         MAY 9, 2024

3

4        WITNESSES FOR THE GOVERNMENT:                    PAGE

5

6        SHANNON MARKEL
           Sworn                                            6
           Direct Examination by MS. HAGAN                  7
7          Cross-Examination by MR. NIETO                  37
           Redirect Examination by MS. HAGAN              52
8          Witness Excused                                 54

9        JON SHUMWAY
           Sworn                                           55
10         Direct Examination by MS. HAGAN                 55
           Cross-Examination by MR. NIETO                  66
11         Witness Excused                                 70

12       PATRICK WINN
           Sworn                                           71
13         Direct Examination by MS. HAGAN                 71
           Witness Excused                                 75

14

15

16

17

18

19

20

21

22

23

24

25

Motions Hearing 5/9/24

1                    P R O C E E D I N G S

2         (10:14 a.m.)

3              THE COURT:  Ms. McGuinn, you may call the case.

4              MS. MCGUINN:  Yes, Your Honor.  Good morning.

5    Assistant United States Attorneys Colleen McGuinn and Kim Hagan

6    on behalf of the Government, calling United States of America

7    versus Christopher Kenji Bendann.  This is Criminal Case Number

8    JKB-23-278.  Standing to my right, Your Honor, is Special Agent

9    Rachel Corn as well as Special Agent Callista Walker with the

10   FBI.

11             THE COURT:  Good morning.  Good morning, Mr. Nieto.

12             MR. NIETO:  Yes.  Good morning, Your Honor.  For the

13   record, Christopher Nieto and Gary Proctor on behalf of

14   Mr. Bendann who is standing to our left -- or my left.

15             THE COURT:  Okay.  Good morning.  You may all be

16   seated.

17        Ms. McGuinn, we're here for a hearing on two pretrial

18   motions filed by the defendant.  First, the motion to suppress

19   evidence obtained through search warrants, which is docketed at

20   ECF Number 78 land second, the defendant's motion to suppress

21   evidence obtained from a cell phone docketed at ECF Number 79.

22        The defendant has made the motions but the way the

23   criminal law works, the Government really has the burden now of

24   going forward and demonstrating the lawfulness of the

25   investigative steps that were taken in this case and,

1    accordingly, my expectation is that the Government will be

2    ready to go forward first with its evidence.

3                MS. MCGUINN:  Yes, Your Honor.

4                THE COURT:  Are we on the same page?

5                MS. MCGUINN:  Yes, Your Honor.

6                THE COURT:  And agreed, Mr. Nieto?

7                MR. NIETO:  Yes, Your Honor.

8                THE COURT:  Okay.  And Ms. McGuinn, with that in

9    mind, give me a little bit of a roadmap of how you hope to

10   proceed this morning.

11               MS. MCGUINN:  Thank you, Your Honor.  The Government

12   would like to proceed with the second motion, the cell phone

13   motion first.  We have witnesses for that.  We have three

14   witnesses, Detective Markel from Baltimore County Police,

15   former Special Agent Patrick Winn of the FBI, and Mr. Jon

16   Shumway, who is retired also with the FBI but was their

17   forensic examiner who was on the scene at the time of the

18   execution of the warrant.

19         So we would like to present the testimony first.

20   Ms. Hagan is going to handle that motion.  And then, if Your

21   Honor agrees, we can conclude that motion and move to the, I

22   guess, first motion dealing with the search warrant.  At that

23   time counsel anticipates that that will just be more of an oral

24   argument based on the warrants that were submitted to Your

25   Honor.

1        THE COURT:  Because they're rooted in questions about
2   the sufficiency of the supporting affidavits.
3        MS. MCGUINN:  Yes, Your Honor.
4        THE COURT:  Yep, I get it.
5   Okay.  Let's deal with the issues that require the
6   testimony first.  That sounds like the second motion.
7        And, Mr. Nieto, any preliminary thoughts before we get
8   started in the nature of roadmapping or concerns about the
9   Court's plan?
10       MR. NIETO:  No, Your Honor.  I spoke with Government
11  counsel.  We thought ECF 79 should go first and then ECF 78.  I
12  would respectfully make the motion to sequester the witnesses.
13       THE COURT:  Yeah.
14       MR. NIETO:  But otherwise, Your Honor, that's my
15  understanding of the hearing today.
16       THE COURT:  Very good.  The motion's granted.  Anyone
17  who expects to give testimony during this motions hearing is
18  now required to step out of the courtroom and stay out of the
19  courtroom and only be in the courtroom during their own
20  testimony, and after they have been excused as a witness, and
21  to the extent that that applies to you, just go out in the
22  vestibule.  Don't go far because we don't know exactly when we
23  might need you, and we'll be squared away.
24  Okay.  Ms. Hagan, you may call your first witness.
25       MS. HAGAN:  Your Honor, the Government calls

 1    Detective Shannon Markel.

 2            THE COURT:  Shannon Markel.  How do I spell that?

 3    M-a-r-k-l-e?

 4            MS. HAGAN:  M-a-r-k-e-l.

 5            THE COURT:  Okay.  Stop right there if you would,

 6    stand and face our clerk, raise your right hand.

 7            THE CLERK:  Good morning.

 8        (Shannon Markel was duly sworn.)

 9            THE CLERK:  Thank you.  You can have a seat.

10            THE WITNESS:  Good morning, Your Honor.

11            THE COURT:  Good morning.

12            THE CLERK:  If you don't mind adjusting that

13    microphone, make sure you're speaking directly into it.

14            THE WITNESS:  Okay.

15            THE CLERK:  Please state and spell your first and

16    last name for the record.

17            THE WITNESS:  Yes.  Corporal Shannon, S-h-a-n-n-o-n,

18    last name Markel, M-a-r-k-e-l.

19            THE COURT:  So here's the deal with that microphone.

20    It doesn't pick up well if it isn't right by your face.  So you

21    slide it along the rail on the right side, the base of it, and

22    bring it back towards you, and let the mic be more sort of

23    perpendicular sticking out in front of your face.

24            THE WITNESS:  Okay.

25            THE COURT:  That's it.  Because what happens is

Direct Examination - Shannon Markel

1    witnesses start strong and then they fade out.  So it's got to

2    be closer even than that, unfortunately.  Two inches.

3                 THE WITNESS:  How's that?

4                 THE COURT:  Perfect.  You got it.

5           Your witness, ma'am.

6                 MS. HAGAN:  Thank you.

7                          DIRECT EXAMINATION

8    BY MS. HAGAN:

9    Q.    Good morning, Detective Markel.

10   A.    Good morning.

11   Q.    Can you tell us how you are employed?

12   A.    Yes.  I'm currently employed with Baltimore County Police

13   Department.

14   Q.    And how long have you been employed with the Baltimore

15   County Police Department?

16   A.    17 years.

17   Q.    What is your current assignment?

18   A.    I'm currently a corporal in the Towson precinct in the

19   patrol division.

20   Q.    And how long have you held that position?

21   A.    Since January 2024.

22   Q.    And prior to that position in patrol as a supervisor, can

23   you tell us what your previous assignments were?

24   A.    Sure.  So I started with Baltimore County Police

25   Department in 2006.  I was assigned to the patrol division.  I

1    remained in that position for approximately eight years before

2    moving to patrol-level investigations.

3         After that, in approximately 2014, I was promoted to

4    Criminal Investigations Bureau detective in the Violent Crimes

5    Unit.  I was there for approximately four years.

6         After that, I was assigned to the Crimes Against Children

7    Unit for approximately five years; and then January 2024, I was

8    able to achieve promotion to the rank of corporal and now I'm

9    back in patrol.

10   Q.   Okay.  I'm going to direct your attention to January 21st

11   of 2023.  Did you become aware of a report to the Baltimore

12   County Department of Social Services regarding a teacher at the

13   Gilman School in Baltimore?

14   A.   Yes.

15   Q.   And what were the nature of the allegations that were

16   reported to Baltimore County Department of Social Services?

17   A.   Sure.  It was reported that there was a teacher at the

18   Gilman School who was reportedly providing alcohol to students

19   in exchange for them to take off their clothes and run around

20   naked in various locations within Baltimore County.

21   Q.   And did you learn what the current status was of the

22   teacher at that time?

23   A.   He had been recently terminated from Gilman.

24   Q.   And do you recall the --

25             THE COURT:  So the school's in the city but the

1    allegations were that the conduct that was reported happened in

2    the county?

3                    THE WITNESS:  Correct, Your Honor.

4                    THE COURT:  Next question.

5    BY MS. HAGAN:

6    Q.    And what was the teacher's name?

7    A.    Christopher Kenji Bendann.

8    Q.    And in response to the report to the Baltimore County

9    Department of Social Services, to whom did they report?

10   A.    I'm sorry, can you repeat the question?

11   Q.    Who did the Department of Social Services report that

12   information to?

13   A.    Yeah.  So it was a referral through Baltimore County

14   Social Services, which was also -- which was also forwarded to

15   the Baltimore County Police Department Crimes Against Children

16   Unit for followup.

17   Q.    And did you assume primary case responsibility?

18   A.    Yes, ma'am.

19   Q.    Okay.  And as part of the investigation and followup, were

20   there forensic interviews that were conducted with two

21   different victims?

22   A.    Yes.

23   Q.    Former students?

24   A.    Yes.

25   Q.    And where were those interviews conducted?

Direct Examination - Shannon Markel

1    A.    At the Baltimore County Child Advocacy Center.

2    Q.    And was one of the victims that was forensically

3    interviewed the victim who was identified in the indictment in

4    this case?

5    A.    Yes.

6                THE COURT:    What's the Baltimore County Child

7    Advocacy Center?

8                THE WITNESS:    Sir, it's a community center warehoused

9    in the health department, and it's where we comprise our

10   multidisciplinary team which essentially assists with any child

11   abuse cases, child maltreatment.  We're often paired with

12   social workers, nurses, doctors, State's Attorneys, where we

13   just support the community when it comes to child maltreatment.

14               THE COURT:    Got it.  Next question.

15   BY MS. HAGAN:

16   Q.    And were the victims forensically interviewed at the Child

17   Advocacy Center, and if you could explain what that means?

18   A.    Yes.  So when we receive a case at the Child Advocacy

19   Center, our first steps is to schedule what we call forensic

20   interview with the child and the parent.

21         The child is interviewed by a certified forensic

22   interviewer, typically a social worker, and it's just -- it's

23   just an opportunity for us to explore whether maltreatment or

24   abuse has occurred.  It's a safe, supportive space for the

25   child.  It's an evidence-gathering and also reliability and

Direct Examination - Shannon Markel

1  credibility gathering-type interview using open-ended-style

2  questions.

3  Q.    Okay.  And as part of the forensic interview in particular

4  of the victim who's identified in this particular indictment,

5  did the victim provide his cell phone and iPad and consent to a

6  review and download of those devices?

7  A.    Yes, he did.

8  Q.    And did you have an opportunity to review the contents of

9  those extractions?

10 A.    I did.

11 Q.    And based on your review of those materials, did you seek

12 to obtain a search warrant for certain locations and a person?

13 A.    Yes.

14 Q.    Can you identify the person and the locations for which

15 you sought a search warrant?

16 A.    Sure.  The search warrant was prepared for the address of

17 115 Stanmore Road, Baltimore, Maryland 21209; and the person

18 was Christopher Kenji Bendann, date of birth 7/1/1984.

19 Q.    And was there also a vehicle that was included as well?

20 A.    Correct, yes.  Also listed on the search warrant was a

21 vehicle.  It was a 2009 Honda CR-V, Maryland Tag 1AK6146 listed

22 to the defendant.

23 Q.    And did you include in the search warrants for those

24 locations and the individual the information that you knew at

25 the time of Christopher Bendann, like his known residence at

Direct Examination - Shannon Markel

1    the time?

2    A.    That's correct.

3    Q.    And how about his personal identifying information such as

4    his date of birth, was that included as well?

5    A.    Yes, ma'am.

6    Q.    And where had you gathered that information from?

7    A.    Through MVA searches.

8    Q.    Did those search warrants that you sought also authorize

9    the search and seizure of Mr. Bendann's electronic devices?

10   A.    Yes.

11   Q.    And that would include cell phone, iPad, things of that

12   nature?

13   A.    That's correct.

14   Q.    And did the warrants also authorize the seizure of

15   Mr. Bendann's biometric data in order to unlock any electronic

16   devices?

17   A.    Yes.

18   Q.    And can you explain what you mean when we use the phrase

19   "biometric data"?

20   A.    Sure.  Biometric data would include facial recognition,

21   which would be his facial image, fingerprint, and his eyes.

22   Q.    And is that commonly requested in search warrant

23   applications when you are seeking to search and seize

24   electronic devices in order to unlock them?

25   A.    Yes.

Direct Examination - Shannon Markel

1    Q.    And were you granted search warrants for the person of

2    Mr. Bendann, his residence, and his vehicle?

3    A.    Yes.

4            MS. HAGAN:    Your Honor, may I approach the witness

5    with Government Exhibit 1?

6            THE COURT:    You may, and you don't have to ask.

7        Who issued the warrant?

8            THE WITNESS:    Your Honor, it was Judge Karen

9    Pilarski.

10           THE COURT:    Baltimore County District Court?

11           THE WITNESS:    Circuit Court.

12           THE COURT:    Circuit Court, thank you.

13   BY MS. HAGAN:

14   Q.    Detective Markel, I'm going to ask you to take a look at

15   the contents of Government Exhibit 1 and tell me if that

16   document contains the search warrants that you just described,

17   the warrants themselves, as well as the affidavit.

18   A.    Yes, it does.

19   Q.    And you indicated they were signed by Judge Pilarski.

20   What was the date that you actually received the search

21   warrant?

22   A.    Sure.  It was February 1st, 2023.

23   Q.    And I'm just going to direct your attention to Page 4 of

24   your affidavit, Paragraph 4.  Is that one of the locations in

25   Government Exhibit 1 in which you are explaining your request

1    to seize biometric data?

2    A.    Yes.

3    Q.    And also directing your attention to Page 12.  Does that

4    also specify that you are seeking authorization to request

5    biometric data of Mr. Bendann?

6    A.    That's correct.

7    Q.    And directing your attention to Page 14, does that also

8    specify the conduct or actions that you are seeking

9    authorization in order to obtain biometric data from

10   Mr. Bendann?

11   A.    Yes.

12   Q.    And can you just read that portion so we have an

13   understanding of how you physically would obtain the biometric

14   data?

15   A.    Sure.  Which --

16   Q.    14.

17   A.    Start at the top?

18   Q.    The specific actions regarding the biometric data would

19   be --

20   A.    Okay.

21   Q.    I'm sorry, it would be the fourth paragraph down, just

22   above --

23   A.    Sure.

24   Q.    -- the heading.

25   A.    "Based on the foregoing, if law enforcement personnel

Direct Examination - Shannon Markel

1    encounter devices subject to seizures pursuant to this warrant
2    it may be unlocked using the aforementioned biometric features.
3    The warrant your affiant is applying for would permit law
4    enforcement personnel to, one, press and swipe the fingers
5    including thumbs of Christopher Kenji Bendann to the
6    fingerprint scanner of the seized devices; two, hold the device
7    in front of Christopher Kenji Bendann to activate the facial
8    recognition feature; and/or, three, hold the device in front of
9    the face of Christopher Kenji Bendann and activate the iris
10   recognition feature for the purpose of attempting to unlock the
11   device and attempting to access data contained in the device in
12   order to search for evidence of the Maryland Criminal Codes
13   listed above as authorized by this warrant."
14   Q.   Thank you.  And when were these search warrants actually
15   executed?
16   A.   They were executed on February 3rd, 2023.
17   Q.   And tell us what, if any, preparation and planning
18   occurred prior to the execution of the search warrants?
19   A.   Sure.  We prepared an operations plan.  And the operations
20   plan is -- it's a routine procedure.  It's a form that we
21   complete which basically identifies all possible residents,
22   occupants of the residence, any hazards that we might encounter
23   when we try to execute the warrant, and how we're going to
24   mitigate those and also any local hospitals and things in the
25   area.  We do complete a full background packet for any possible

Direct Examination - Shannon Markel

1    residents, occupants of the residence during that time.

2    Q.    Okay.  And is the operational plan in writing?

3    A.    Yes.

4    Q.    I'm going to show you what's marked as Government Exhibit

5    2.  You can take a look at Government Exhibit 2 and tell me if

6    you recognize this document?

7    A.    Yes.  This is the operations plan.

8    Q.    And who is provided a copy of the operations plan?

9    A.    Everyone who's going to be present at the execution of the

10   search warrant will get a copy of the operations plan.

11   Q.    And did that include yourself?

12   A.    Yes.

13   Q.    And as the lead detective, did you familiarize yourself

14   with the contents of the operations plan?

15   A.    Yes.

16   Q.    And did that include the details that were provided on the

17   target location?

18   A.    Yes.

19   Q.    And how about the details provided on the target person,

20   Mr. Bendann?

21   A.    Yes.

22   Q.    And did the details in the operation plan include

23   Mr. Bendann's date of birth?

24   A.    Yes, it did.

25   Q.    Approximately what time on February 3rd was the search

Direct Examination - Shannon Markel

1    warrant on the residence executed?

2    A.    Approximately 5:18 a.m.

3    Q.    And can you tell us how entry was made into the residence?

4    A.    Yeah.   The Baltimore County Tactical Unit was utilized for

5    this execution of this warrant.

6    Q.    And were you physically present when the Tactical Unit

7    approached the residence?

8    A.    No.

9    Q.    What was your location?

10   A.    I was stationed in a vehicle monitoring via radio.

11   Q.    And were you nearby?

12   A.    Yes.

13   Q.    Approximately how far?

14   A.    I was probably a block away.

15   Q.    Okay.   And have you had an opportunity to review body-worn

16   camera footage provided by the Tactical Unit?

17   A.    Yes.

18   Q.    Did you have a sense of how the initial approach occurred?

19   A.    Yes.

20   Q.    Can you tell us what happened?

21   A.    Sure.   The Tactical Unit approached the front door.   They

22   knocked and began giving commands for any occupants to come to

23   the front door.   And the defendant came to the door and was

24   secured at the front door of the location.

25   Q.    And was there anyone else in the residence at the time?

Direct Examination - Shannon Markel

1    A.    No.

2    Q.    And what type of residence was this?  Single family home,

3    townhome?

4    A.    It was a townhome.

5    Q.    One, two levels?

6    A.    Yes, it was two levels.

7    Q.    Okay.  And what hap -- well, I'm assuming the Tactical

8    Unit cleared the residence?

9    A.    Yes.

10   Q.    And after they cleared the residence, what type of

11   communication is relayed to you?

12   A.    They relayed that the home was safe and secure, that it

13   was okay for us to enter and that the defendant was secured in

14   the dining room of the residence.

15   Q.    And at that point did you actually respond to the location

16   and go into the residence?

17   A.    Yes.

18   Q.    Anyone else with you?

19   A.    Members of the Baltimore County Police Department, FBI

20   personnel, as well as a Frederick County K9 officer.

21   Q.    And would you as a detective have been wearing a body-worn

22   camera at the time?

23   A.    No.

24   Q.    How about any patrol officer that accompanied you?

25   A.    Yes.  We had a patrol officer on scene who was equipped

Direct Examination - Shannon Markel

1    with a body-worn camera.

2    Q.    Tell us where Mr. Bendann was located when you first

3    entered the residence.

4    A.    He was seated in a chair in the dining room.

5    Q.    Do you recall if he was in flex cuffs?

6    A.    He was.

7    Q.    And how was he dressed?

8    A.    He was in his boxer shorts and he didn't have a shirt on.

9    Q.    And do you recall whether it was dark out during this hour

10   or still light?

11   A.    It was dark.

12   Q.    And did there come a point in time where you or one of

13   your colleagues removed the flex cuffs from Mr. Bendann?

14   A.    Yes.

15   Q.    When was that done?  Do you recall?

16   A.    It was pretty shortly after entering the residence and

17   making contact with him.  Once we determined that he wasn't a

18   threat, then he was unhandcuffed.

19   Q.    You've had an opportunity to review the body-worn camera

20   footage of the patrol officer that was present; is that right?

21   A.    Yes.

22            MS. HAGAN:   Your Honor, at this time the Government

23   would move to introduce Government Exhibit 3, which is the

24   body-worn camera footage worn by one of the patrol officers

25   present.

Direct Examination - Shannon Markel

1    With the Court's permission, I'd like to start to play it,

2  stop it at certain portions so that I can ask Detective Markel

3  questions.  I do not intend to play the body-worn camera

4  footage in its entirety.  There are long periods of time where

5  members of law enforcement are searching the residence, so I'm

6  really hoping to focus on just key points pertaining to issues

7  before the Court today.

8            THE COURT:  Any objection?

9            MR. NIETO:  No, Your Honor.

10            THE COURT:  Received, and you may proceed as

11  proposed.

12            MS. HAGAN:  Thank you.

13    Okay.  Ms. McGuinn, I'd like to go ahead and start the

14  beginning of the body-worn camera footage.  If we could just

15  move it to where the sounds starts, close to one minute.  And,

16  again, this is Government Exhibit 3, for the record.

17        (A video was played in the courtroom.)

18            MS. HAGAN:  Ms. McGuinn, can you pause it right

19  there?

20            THE WITNESS:  I'm sorry, ma'am.  Does this screen

21  work?

22            MS. HAGAN:  Is it not on?

23            THE COURT:  That screen's not working.

24            THE WITNESS:  Should I turn it on?

25            THE COURT:  Hold on.  Let the courtroom deputy clerk

Direct Examination - Shannon Markel

1    handle it.

2        Counsel, are your screens working?

3            MS. HAGAN:  Yes, Your Honor.

4            MR. NIETO:  Yes, Your Honor.

5            THE COURT:  A, call IT; B, let's rig a mic so that

6    the witness can move to the jury box.

7        Go ahead and pick up your things, Detective -- Corporal.

8    Excuse me.  Go to the first row of the jury box, come about

9    two-thirds of the way down, situate yourself in front of one of

10   those screens and then we'll rig a mic for you in just a

11   second.

12           THE WITNESS:  Okay.

13           THE COURT:  Come down to the third screen, assuming

14   it's working.

15           THE WITNESS:  It is.

16           THE COURT:  I don't think there's going to be enough

17   extension on that.  They have to plug it into the floor unit.

18       (Pause in Proceedings.)

19           THE COURT:  Give me a mic check, Corporal.

20           THE WITNESS:  Check, testing 1, 2.

21           THE COURT:  Great.

22           THE WITNESS:  All right.

23           THE COURT:  You may continue.

24           MS. HAGAN:  Thank you.

25   BY MS. HAGAN:

Direct Examination - Shannon Markel

1    Q.    Detective Markel, I'm going to just replay the last --

2    where we started so you have an opportunity to view this first

3    minute of the body-worn camera footage.

4         (Video Resumed.)

5    BY MS. HAGAN:

6    Q.    Detective Markel, were you able to hear your voice in the

7    background?

8    A.    Yes.

9    Q.    And who were you speaking with?

10   A.    I was speaking with -- initially I was speaking with the

11   defendant, Mr. Bendann.

12   Q.    And is that him that is seated there in the upper portion

13   of the screen?

14   A.    Yes, ma'am.

15   Q.    And what room or rooms is Mr. Bendann seated in or

16   between?

17   A.    It's between -- it's the dining room but it's like right

18   between the kitchen and the dining room.

19   Q.    And can you explain for us the exchange that occurred

20   between you and Mr. Bendann?

21   A.    Sure.  So I was telling him that we were going to take all

22   of our gear off so that we could come in to continue to execute

23   the search warrant, and then he had mentioned that he has an

24   attorney and that he was instructed, I guess, to notify her

25   when -- you know, should this happen.  And I explained to him

Direct Examination - Shannon Markel

1    that I would come back in and speak with him and that I offered

2    to get him some clothing for the time being.

3    Q.    And did he indicate he would like clothing?

4    A.    Yes.

5    Q.    Okay.  And from where were you going to retrieve the

6    clothing?

7    A.    From his bedroom.

8    Q.    And did you retrieve clothing for him?

9    A.    I did.

10    Q.    Okay.  Now, in the -- where we have stopped it here at

11    1:49, is he still wearing the flex cuffs?

12    A.    No.

13    Q.    And were you the one that removed them from him, do you

14    recall?

15    A.    I was not.

16    Q.    All right.  And so from this point on, do you retrieve

17    clothing for him upstairs?

18    A.    Yes.

19    Q.    From the bedroom?

20    A.    Yes.

21    Q.    Okay.  And is he given an opportunity to put those clothes

22    on there?

23    A.    Yes.

24         MS. HAGAN:  Okay.  Ms. McGuinn, I'm going to ask that

25    you go ahead and play.

Direct Examination - Shannon Markel

1              MS. MCGUINN:  From that point?

2              MS. HAGAN:  If you could go to approximately 3

3    minutes and 30 seconds in.

4         (A video was played in the courtroom.)

5              MS. HAGAN:  Can you pause it, Ms. McGuinn?

6    BY MS. HAGAN:

7    Q.   Detective Markel, what did you mean just now when you said

8    "We might need him for certain devices"?

9    A.   Yes.  I didn't want the patrol officer to transport him

10   just yet because we may have needed him for his biometrics,

11   facial recognition, fingerprint, and eyes.

12   Q.   In the event that there were electronic devices that were

13   located?

14   A.   Yes.

15             MS. HAGAN:  Ms. McGuinn, can you move to

16   approximately 7 minutes and 50 seconds in?

17        (Video Resumed.)

18   BY MS. HAGAN:

19   Q.   Detective Markel, when this portion of the video started,

20   did you advise Mr. Bendann of his Miranda warnings?

21   A.   Yes.

22   Q.   And were you doing that verbally by itself or were you

23   also showing him anything in writing?

24   A.   I was doing it verbally.

25   Q.   And just so that the record is clear, since this

1    conversation's happening in the background of this video, can
2    you just sort of recap for us that exchange after you explained
3    Miranda to Mr. Bendann?
4    A.    Sure.  So I advised him of his rights.  He indicated that
5    he understood and he -- I also advised him that I was
6    interested in speaking with him or conducting an interview with
7    him in regards to the investigation.
8         Mr. Bendann stated that his attorney had advised him not
9    to talk about the case or not to speak with anyone in reference
10   and I just -- I told him that that was fine and that if, you
11   know, if he would like, he could make contact with his attorney
12   and then we could set up an interview for a later date and
13   time.
14   Q.    Okay.  And then did he ask to use the restroom towards the
15   end of this clip?
16   A.    Yes.
17   Q.    And was he escorted to a restroom?
18   A.    Yes, he was.
19   Q.    Do you recall if he was escorted to an upstairs or a
20   downstairs restroom?
21   A.    I believe he was escorted upstairs.
22         MS. HAGAN:    Okay.  Can I, Ms. McGuinn, have you move
23   to 11 minutes into the video?
24         (Video Resumed.)
25         MS. HAGAN:    Can you pause that?

Direct Examination - Shannon Markel

1    BY MS. HAGAN:

2    Q.    What did you just show Mr. Bendann?

3    A.    I showed Mr. Bendann a copy of the sealing order.

4    Q.    What other paperwork did you have with you in the

5    residence during the execution of the search warrant?

6    A.    Sure.  I had the search warrant itself and I had the

7    operations plan.

8    Q.    And while this search warrant was being executed while

9    Mr. Bendann is seated here in this particular area, where did

10   you keep that paperwork?

11   A.    It was in my file folder.  I had a case file folder, and I

12   kept that -- there was a breakfast bar to the left behind this

13   wall that you cannot see, but there's a breakfast bar right

14   there and I had my paperwork sitting on that.

15         MS. HAGAN:  Okay.  Ms. McGuinn, can you move to 13

16   minutes into the video?

17         (Video Resumed.)

18         MS. HAGAN:  Can you pause it?

19   BY MS. HAGAN:

20   Q.    What's happening with Mr. Bendann in that clip?

21   A.    He's being escorted upstairs to the bathroom.

22   Q.    And after he's permitted to use the bathroom, is he then

23   escorted back down to the same location in that chair?

24   A.    Yes, ma'am.

25   Q.    And during any of the time periods that we are not

1    playing, was there any questioning of Mr. Bendann?

2    A.    No.

3    Q.    No interrogation?

4    A.    No.

5    Q.    Were there any threats that were made to Mr. Bendann?

6             THE COURT:   One moment.

7         (Pause in Proceedings.)

8             THE COURT:   You may continue.

9    BY MS. HAGAN:

10   Q.    Any threats to Mr. Bendann during these time periods?

11   A.    No.

12            MS. HAGAN:   Ms. McGuinn, I'm going to ask you to move

13   to 27 minutes into the video.

14        (Video Resumed.)

15            MS. HAGAN:   Ms. McGuinn, can you pause that?

16   BY MS. HAGAN:

17   Q.    The beginning of this clip at 27 minutes into the video,

18   Detective Markel, was that you coming from upstairs?

19   A.    Yes.

20   Q.    And who is the individual that just followed you, the

21   gentleman with the glasses on?

22   A.    Sure.  He's the federal forensic technician that was on

23   scene.  I believe his name is Detective Shumway.

24   Q.    And at this point, have you recovered any electronic

25   devices?

Direct Examination - Shannon Markel

1    A.    Yes.

2    Q.    And from where was an electronic device recovered and what

3    type?

4    A.    We retrieved a cell phone from the night stand in

5    Mr. Bendann's bedroom.

6           MS. HAGAN:  Ms. McGuinn, can you move to --

7    BY MS. HAGAN:

8    Q.    And why are you then going into the kitchen area at this

9    point?

10   A.    I was going into the kitchen area so it could be

11   inventoried on our inventory sheet.

12          MS. HAGAN:  Okay.  Ms. McGuinn, can you move to 28

13   minutes and 30 seconds in?

14          (Video Resumed.)

15          MS. HAGAN:  And stop there, Ms. McGuinn.

16   BY MS. HAGAN:

17   Q.    Okay.  And looks like you just came back again from the

18   upstairs level?

19   A.    Yes.

20   Q.    And what were you doing up there again?

21   A.    So upon executing the search warrants we will letter each

22   room and sketch the inside of the residence so I was trying to

23   ascertain which letter number correlated with Mr. Bendann's

24   bedroom so I could note it on the inventory sheet.

25   Q.    And until this point are there other law enforcement

1   individuals that are there inside the residence documenting the

2   rooms and taking photographs and things of that nature?

3   A.    Yes.

4   Q.    Okay.  And so were you able to confirm which room from

5   which the phone was recovered?

6   A.    Yes.

7          MS. HAGAN:  If we could just keep letting it play,

8   Ms. McGuinn.  Approximately 29 minutes in we're focusing on Mr.

9   Bendann.  Thank you.

10         (Video Resumed.)

11         MS. HAGAN:  Can you pause it right there?

12  BY MS. HAGAN:

13  Q.    Okay.  Detective Markel, explain to us what transpired

14  just now.

15  A.    Sure.  So I had the cell phone that I recovered from his

16  bedroom.  I approached the defendant and I presented the cell

17  phone to his face, at which time it didn't immediately

18  recognize his face and it automatically prompted for a passcode

19  to be entered.  Mr. Bendann, without prompting, put his

20  passcode into the phone while I was standing next to him.

21  Q.    And so explain to us why you took the cell phone and

22  approached him to put it up to his face.  To begin with, why

23  did you do that?

24  A.    Because it was passcode locked.

25  Q.    And is that the reason why you include in search warrants

Direct Examination - Shannon Markel

1    such as this authorization to seize biometric data to unlock
2    this cell phone?
3    A.    Yes.
4    Q.    And so you held it up to Mr. Bendann's face and what
5    happened?
6    A.    So I held it up to his face and it didn't immediately
7    recognize his face and the phone prompted for a passcode, and
8    Mr. Bendann entered his passcode.  I'm sorry.
9    Q.    That's okay.  And when you say it prompted for a passcode
10   because it did not recognize his face, did that prompting occur
11   as you were still holding the phone up to Mr. Bendann?
12   A.    Yes.
13   Q.    And what did the prompting look like?  How did you know it
14   was requesting a passcode?
15   A.    Sure.  So when I presented the phone to his face, the
16   screen bounced, indicating that it did not recognize his face;
17   and then the number -- the number pad came up with the six
18   digits prompting for a passcode.
19   Q.    And did you say anything to him at that point in time?
20   A.    No.
21   Q.    Did you give him any direction or any commands?
22   A.    No.
23   Q.    Did you say anything at all out loud?
24   A.    No.
25   Q.    And after Mr. Bendann entered -- well, as Mr. Bendann

Direct Examination - Shannon Markel

1  entered the passcode, could you see what he entered?

2  A.    Yes.  I could see -- I could clearly see the first four

3  digits.

4  Q.    Do you recall what they were?

5  A.    Yes.  It was 0701.

6  Q.    And did those initial four digits seem familiar to you?

7  A.    Yes.

8  Q.    And how did you recog -- what did you recognize them as?

9  A.    I recognized it as his -- the first four digits of his

10  birthday, but I wasn't completely certain at that time.

11  Q.    And he did enter a complete six-digit passcode?

12  A.    Yes.

13  Q.    But you only saw the first four?

14  A.    That's correct.

15  Q.    And after he entered the passcode, what did you do with

16  the phone?

17  A.    I brought it to Shumway.

18  Q.    And --

19         THE COURT:  Who was holding the phone when the

20  defendant entered the digits?

21         THE WITNESS:  I was holding the phone.

22         THE COURT:  Next question.

23  BY MS. HAGAN:

24  Q.    Why did you then hand the phone to Mr. Shumway?

25  A.    I handed the phone to Mr. Shumway because he is the

Direct Examination - Shannon Markel

1    federal forensic technician on scene, and I gave it to him to

2    analyze or to take custody of.

3    Q.    And is that what's happening as we have frozen the screen

4    here at this moment?

5    A.    That's correct.

6              MS. HAGAN:  Ms. McGuinn, can you keep playing?

7         (Video Resumed.)

8              MS. HAGAN:  Can you pause it?

9    BY MS. HAGAN:

10   Q.    Detective Markel, where did you just go?

11   A.    I went back to the breakfast bar kitchen area, kitchen,

12   dining room area.

13             MS. HAGAN:  Okay.  Can you hit play, Ms. McGuinn.

14        (Video Resumed.)

15             MS. HAGAN:  Can you pause it, Ms. McGuinn?

16   BY MS. HAGAN:

17   Q.    Can you explain what just happened there, Detective

18   Markel?

19   A.    Yes.  So while I was back at the breakfast bar, I was

20   looking at my operations plan to verify the defendant's date of

21   birth.  Two statements are made.  The first statement, I was

22   reading the operations plan confirming what I was reading and I

23   said "070184."

24        The second statement I approached the defendant and I was

25   directing a statement in his direction and I said "070184" and

Direct Examination - Shannon Markel

1    he confirmed "Yes."

2    Q.    And did you see Mr. Shumway enter the kitchen area in this

3    last clip that we just watched?

4    A.    Yes.

5    Q.    And did you have a conversation with him when he entered

6    the kitchen area, or do you recall him saying anything to you?

7    A.    I believe -- I believe he was trying to confirm the

8    passcode as well and confirm the date of birth as well.

9    Q.    And --

10                THE COURT:  With whom?

11                THE WITNESS:  With me.

12                THE COURT:  Next question.

13   BY MS. HAGAN:

14   Q.    And did you have an opportunity to look at the operations

15   plan?

16   A.    Yes, I did.

17   Q.    And did you confirm the date of birth as 07/01/84?

18   A.    Yes.

19   Q.    And did you relay that verbally to Mr. Shumway?

20   A.    I did.

21   Q.    And you indicated that you ended up saying it out loud

22   twice?

23   A.    Yes.

24   Q.    And tell us what Mr. Bendann said in response the second

25   time.

Direct Examination - Shannon Markel

1    A.    He said "Yes."

2    Q.    And when you said it the second time, do you recall

3    whether you were directing it at Mr. Bendann or Mr. Shumway?

4    A.    I was directing it at Mr. Bendann.

5    Q.    Okay.  Now -- and Mr. Bendann said "Yes," you indicated;

6    is that right?

7    A.    Correct.

8    Q.    Okay.  Now, had Mr. Bendann not responded to you, would

9    you have relayed the 0701 --

10              MR. NIETO:  Objection, Your Honor.

11              THE COURT:  Sustained.  Next question.  Calls for

12   speculation.

13              MS. HAGAN:  Your Honor, may I be heard on that?

14              THE COURT:  Next question.  You asked him, "Would you

15   have."  That was the predicate to your next question.

16              MS. HAGAN:  Yes, and one of the Government's

17   arguments is inevitable discovery.

18              THE COURT:  I understand that.

19              MS. HAGAN:  Okay.

20              THE COURT:  But the form of the question nonetheless

21   called for speculation so it's sustained.

22   BY MS. HAGAN:

23   Q.    After confirming the date of birth of Mr. Bendann in the

24   operations plan, you did relay that to Mr. Shumway?

25   A.    Yes.

Direct Examination - Shannon Markel

1    Q.    And so essentially you did have the passcode?

2    A.    I did.

3              MS. HAGAN:   Court's indulgence.

4         (Pause in Proceedings.)

5              THE COURT:   You can't ask a question that overtly

6    asks for speculation.   That's why I sustained the objection.

7              MS. HAGAN:   Understood, Your Honor.

8              THE COURT:   I understand where you're going.   It's

9    possible that you could lay a foundation about law enforcement

10   techniques, tactics in these kinds of circumstances.   I've read

11   your brief and I understand what the second theory is.   It's

12   just that you can't come after it that baldly.

13             MS. HAGAN:   Understood, Your Honor.

14             THE COURT:   So I'm not cutting off the line of

15   inquiry.

16             MS. HAGAN:   Yes.

17             THE COURT:   That question was objectionable and

18   that's why I sustained it.

19             MS. HAGAN:   I think at this point the information has

20   been elicited, but I will follow up based on Your Honor's

21   comments.

22   BY MS. HAGAN:

23   Q.    Detective Markel, was it your intention or law

24   enforcement's intention to attempt a passcode, if known, in

25   addition to the biometric data?

Direct Examination - Shannon Markel

| | |
|---|---|
| 1 | MR. NIETO:  Objection, Your Honor. |
| 2 | THE COURT:  Same objection? |
| 3 | MR. NIETO:  It was also the inclusion of "and law |
| 4 | enforcement." |
| 5 | THE COURT:  Okay.  Objectionable as to her |
| 6 | speculating about what others might do.  You can ask her about |
| 7 | what she does and what her training is and what her strategy is |
| 8 | when confronted with this kind of situation. |
| 9 | BY MS. HAGAN: |
| 10 | Q.    Was it your intention, Detective Markel, to obtain the |
| 11 | date of birth and passcode for that cell phone? |
| 12 | A.    Yes. |
| 13 | Q.    And if you did obtain what you thought was the passcode, |
| 14 | was it your intention to relay it to Mr. Shumway? |
| 15 | A.    Yes. |
| 16 | Q.    And based on what Mr. Shumway's purpose was there present |
| 17 | for the search warrant execution, why was it necessary for you |
| 18 | to relay that information to Mr. Shumway? |
| 19 | A.    So that the device could be analyzed. |
| 20 | Q.    And my last question, Detective Markel, you indicated that |
| 21 | the search warrant, Government Exhibit 1, was signed by Judge |
| 22 | Pilarski.  District Court or Circuit Court Judge?  If you know. |
| 23 | THE COURT:  Would it refresh your memory to look at |
| 24 | the search warrant? |
| 25 | THE WITNESS:  Yes, sir.  I just refreshed my memory. |

1    District Court Judge.

2              MS. HAGAN:  Okay.  Thank you.

3         Your Honor, I have nothing further.

4              THE COURT:  Okay.  Corporal, if you would pick up

5    your papers and so forth and move back to the witness stand

6    where the technology is once again working.

7              THE WITNESS:  Sure.

8              THE COURT:  And cross-examination, Mr. Nieto.

9              MR. NIETO:  My apologies, Your Honor.  I'm sorry?

10             THE COURT:  Cross-examination?

11             MR. NIETO:  Yes, Your Honor.

12             THE COURT:  It's still working?

13             THE CLERK:  Yes.

14                        CROSS EXAMINATION

15   BY MR. NIETO:

16   Q.    And good morning.

17   A.    Good morning.

18   Q.    What is your current rank?  Is it corporal?

19   A.    It's corporal, sir.

20   Q.    Okay.  All right.  So Corporal, you said you have about 17

21   years of experience in law enforcement, right?

22   A.    Yes, sir.

23   Q.    And so I have to assume throughout that time you've

24   executed your fair share of search warrants; is that fair to

25   say?

Cross Examination - Shannon Markel

1    A.    Yes, sir.

2    Q.    All right.  And so as part and parcel -- well, if I may,

3    approximately how many search warrants have you participated in

4    the execution of?

5    A.    Approximately a hundred.

6              THE COURT:  Are you going to use this BWC footage or

7    should we take this down?

8              MR. NIETO:  I think she could take it -- I think it's

9    okay to be taken down.

10             THE COURT:  Let's go ahead and blank the screen.

11   Thank you.  Next question.

12   BY MR. NIETO:

13   Q.    All right.  Now, as part of the execution of the search

14   warrant, the raid team and the investigators get together in

15   advance to discuss how things are going to happen; is that fair

16   to say?

17   A.    Yes.

18   Q.    And sometimes that can happen a day or two before but

19   oftentimes it happens the morning of; is that fair?

20   A.    Correct.

21   Q.    Okay.  So on this particular date, I believe you had

22   indicated that the search warrant was executed at 5:18 a.m.,

23   right?

24   A.    Yes, sir.

25   Q.    And so did you meet with the other law enforcement and

1  members of the tactical raid unit before that?

2  A.    Yes.

3  Q.    Do you remember approximately what time?

4  A.    I believe -- can I check my operations plan?

5  Q.    Absolutely, yes.

6  A.    Okay.  Thank you.

7         THE COURT:  Once you've looked at the document,

8  refreshed your memory, put the document down, tell us you're

9  ready to keep going.

10        THE WITNESS:  Sure.  I believe we briefed at 0500

11 that morning.

12 BY MR. NIETO:

13 Q.    Okay.  About 5 a.m.?

14 A.    Yes.

15 Q.    And so -- and I don't expect you to necessarily remember

16 with specificity, but I'm assuming that that day, right, do you

17 remember what time your work shift began that morning?

18 A.    Yes.  I believe it was 7 o'clock was my work shift start

19 time.

20 Q.    And that's 7:00 a.m., right?

21 A.    7:00 a.m.

22 Q.    So this is before your work shift technically begins?

23 A.    Yes, sir.

24 Q.    And so you're getting up, if you're going to meet with the

25 Tactical Unit at 5:00, I mean, you're getting up at least

Cross Examination - Shannon Markel

1    before 4 o'clock; is that fair?

2    A.    That's correct, yep.

3    Q.    And so as part of your -- when you wake up at 4:00 a.m.,

4    right, maybe you have a cup of coffee, it takes a little bit of

5    time for you to sort of get your senses; is that fair?

6    A.    Sure.

7    Q.    Okay.  And so the decision to execute the search warrant

8    at 5:18 in the morning is a law enforcement decision?

9    A.    That's correct.

10   Q.    And amongst many of the reasons in support of that, one of

11   it, one of the reasons is because at that hour, chances are the

12   people in the home are going to be asleep, right?

13   A.    Correct.

14   Q.    And that minimizes the risk of harm to law enforcement or

15   the destruction of evidence, right?

16   A.    That's correct.

17   Q.    All right.  And this was not a no-knock warrant?

18   A.    That's correct.

19   Q.    Right.  So law enforcement at 5:18 start banging on the

20   door to alert the people within the home that they are there to

21   execute this warrant, correct?

22   A.    Correct.

23   Q.    Okay.  And then I believe your testimony was that

24   Mr. Bendann, per your recollection, had opened the door,

25   tactical team goes in, right?

Cross Examination - Shannon Markel

1    A.    Correct.

2    Q.    Now, the tactical team, they were not dressed the way in

3    which you were dressed in the video, were they?

4    A.    No.

5    Q.    And they're not dressed the way you're dressed today, are

6    they?

7    A.    No.

8    Q.    Now, in fact, they had guns that were out?

9    A.    Sure.

10    Q.    Right?  Did they have like a riot shield to get in?

11    A.    Yes.

12    Q.    Did they have a ram in the off chance they could not open

13    the door?

14    A.    Yes.

15    Q.    All right.  And they had like their full uniforms?

16    A.    Yes.

17    Q.    Now, this is a tactical unit, so they're not wearing what

18    we may ordinarily associate with police officers; is that fair?

19    A.    That's fair.

20    Q.    So it's not like the blues; it's -- almost look like

21    fatigues, don't they?

22    A.    Yes.

23    Q.    Quasi-military vibe to them; is that fair?

24    A.    Yes.

25    Q.    All right.  And so -- and I believe as we were looking at

1    the video, so at least on the main floor, right -- let me take

2    a step back, Corporal.

3        Is it fair to say that the number of law enforcement that

4    entered that house at 5:18 in the morning or at least in

5    general that morning was over a dozen?

6    A.    Yes.

7    Q.    Okay.  Over 20?

8    A.    I'm not sure about that.

9    Q.    Fair.  But a good number of people were in that home,

10   right?

11   A.    Correct.

12   Q.    All right.  And when they enter their home, obviously as

13   you know through your experience, the first thing they want to

14   do is secure the residence?

15   A.    Correct.

16   Q.    Okay.  And by that, they mean they want to make sure

17   there's nobody hiding in a closet or someone else in another

18   room or, I suppose in theory, a victim or someone else in a

19   stage of distress; is that true?

20   A.    Correct.

21   Q.    All right.  So law enforcement in their military fatigues

22   with their guns exposed yell out, right, when they enter the

23   home; is that fair?

24   A.    Yes.

25   Q.    And that happened in this case, too, right?

1  A.    Yes.

2  Q.    They start yelling out, if anyone's here, law enforcement,

3  that kind of stuff?

4  A.    Yes.

5  Q.    And that's also for their protection as well, right?

6  A.    Correct.

7  Q.    And so while they're yelling, they're walking throughout

8  the house, looking to find anyone or anything in any place?

9  A.    Correct.

10 Q.    Okay.  And Mr. Bendann is present in the home while this

11 is happening, right?

12 A.    Yes.

13 Q.    Now, this is at 5:18, and I believe as we had seen in the

14 videos Mr. Bendann is in essence in his underwear, right?

15 A.    Correct.

16 Q.    And so it's based on at least the visual depiction, it

17 wouldn't surprise you to know that he was awakened by the

18 execution of the warrant?

19 A.    Correct.

20 Q.    Right.  And during the time that you saw him sitting

21 there, you didn't see him have coffee or any food or anything

22 like that?

23 A.    No.

24 Q.    Right.  And I believe as we had watched up to roughly

25 about the 30-minute mark, right, when you have the discussion

Cross Examination - Shannon Markel

1   with regards to the passcode with him, do you remember that
2   video that we watched?
3   A.   Yes.
4   Q.   So even 30 minutes in, that is not even 6 a.m., is it?
5   A.   No.
6   Q.   Okay.  Okay.  So you were the affiant or you were the
7   writer of the search warrant?
8   A.   Yes, sir.
9   Q.   Okay.  And so as part of that search warrant, you received
10  permission from the court to get biometric features from
11  Mr. Bendann for the phones or other electronic devices?
12  A.   Yes.
13  Q.   Okay.  And in the 17 years that you've been doing this
14  type of work, cell phones and technologies and computers,
15  everything continues to evolve technologically?
16  A.   Yes.
17  Q.   Is that consistent with your experiences?
18  A.   Yes.
19  Q.   All right.  So maybe 17 years ago we didn't have to deal
20  with passcodes and facial recognition on cell phones to access
21  it, right?
22  A.   Right.
23  Q.   But today's day and age that's the way cell phones are
24  working; is that fair?
25  A.   That's fair.

Cross Examination - Shannon Markel

1    Q.    And so understanding that, you sought permission from the

2    court in advance to allow you to get the biometric features to

3    open the phone, right?

4    A.    Correct.

5    Q.    And you do that specifically because there is always the

6    danger or risk that you would not be able to access the

7    contents of that device without it?

8    A.    Correct.

9    Q.    And in fact, I believe the Government had referenced you

10   to Page 14 --

11   A.    Yes.

12   Q.    -- of the search warrant, specifically for your statement.

13   You say, specifically "Law enforcement personnel may not

14   otherwise be able to access the data contained within the

15   device(s) making the use of biometric features necessary to the

16   execution of the search authorized by this warrant."

17   A.    Correct.

18   Q.    Right.  So entry into the phone is of import to you as an

19   investigator in this case, correct?

20   A.    Correct.

21   Q.    All right.  So when you enter into the home and you begin

22   speaking with Mr. Bendann, I believe you had testified --

23             MR. NIETO:  Court's indulgence.  All right.

24             THE COURT:  Corporal, when Baltimore County executes

25   a search warrant, do they always employ a tactical team?

Cross Examination - Shannon Markel

1           THE WITNESS:  No.

2           THE COURT:  Who made the decision that a tactical

3     team would be employed in this execution?

4           THE WITNESS:  My supervising officer as well as the

5     FBI.

6           THE COURT:  And what was the reason?

7           THE WITNESS:  Destruction of evidence, potential

8     destruction of evidence.

9           THE COURT:  Next question.

10    BY MR. NIETO:

11    Q.   Corporal, were flash bangs used in the execution of this

12    warrant?

13    A.   No.

14    Q.   Were there any dogs that were brought to sniff or alert?

15    A.   Yes.

16    Q.   There were drugs -- I'm sorry, no drugs -- there were

17    dogs, K9s brought to the residence that morning?

18    A.   There was one electronic-sniffing K9 dog.

19    Q.   Okay.  Were there any drones that were utilized in the

20    search of this home?

21    A.   I'm not -- I'm aware of.  I don't know.

22    Q.   Okay.  And forgive me, if you could, the -- sniffing the

23    K9 dog, if you could speak a little bit more about that?

24    A.   Sure.

25    Q.   What type of --

1    A.    It was a Frederick County K9 dog.  The dog is apparently

2    trained to sniff out electronics.

3    Q.    Okay.  And was there like a robot that you had -- that law

4    enforcement had used to help in the search of the home?

5    A.    I believe so.

6    Q.    Okay.  So that means in addition to the more than a dozen

7    law enforcement, there was also a dog and a robot that was used

8    to search the home?

9    A.    Correct.

10    Q.    Okay.  Now, and Mr. Bendann was initially handcuffed,

11    correct?

12    A.    Yes, sir.

13    Q.    But then once you enter and, you know, everyone's secure,

14    he's allowed to put on clothes and the flex cuffs are taken

15    off, right?

16    A.    Yes.

17    Q.    But he's not allowed to leave, though, right?

18    A.    Correct.

19    Q.    Now, in fact, I think as we had seen in the video there's

20    a law enforcement officer, not in uniform, but standing right

21    over him when he's seated in the middle of the room, correct?

22    A.    Correct.

23    Q.    All right.  And that's to make sure nothing untoward

24    happens; is that fair to say?

25    A.    Correct.

Cross Examination - Shannon Markel

1    Q.    All right.  So as we watched in the video, you advise

2    Mr. Bendann of his Miranda rights, correct?

3    A.    Yes.

4    Q.    And at that point in time he invokes his right to have his

5    attorney present --

6    A.    Correct.

7    Q.    -- before speaking with you, right?

8    A.    Yes.

9    Q.    All right.  And you explained to him, and I think it's

10   actually preceding that but you had explained to him that the

11   warrant was under seal?

12   A.    That's correct.

13   Q.    And he didn't understand what that meant, but you

14   explained to him what that meant, right?

15   A.    Correct.

16   Q.    Okay.  And then in the process of explaining to him what

17   was going on, you also told him that pursuant to the warrant,

18   you may need his face or hands at some point for certain

19   things?

20   A.    Correct, yes.

21   Q.    And part of that -- well, not say part of that -- forgive

22   me, Corporal -- but you're saying that because you had court

23   authorization to use his face or his fingerprint to be able to

24   get into the electronic devices?

25   A.    Correct.

Cross Examination - Shannon Markel

1    Q.    But you didn't explain that to him the way in which you

2    explained the sealed warrant, did you?

3    A.    No, I did not.

4    Q.    Right.  And so after the cell phone has been recovered

5    from the upstairs, you have the phone and you walk to

6    Mr. Bendann who's seated in the chair, right?

7    A.    Yes, sir.

8    Q.    And then you holding the phone, you put it right in front

9    of his face, correct?

10   A.    Correct.

11   Q.    And this is, of course, after telling him that pursuant to

12   the warrant, right, pursuant to the Court authorization you're

13   going to need his face at some point?

14   A.    Yes.

15   Q.    And so you put that phone in front of his face, right, and

16   the screen is like most iPhones, right, which will give you the

17   opportunity for the facial recognition?

18   A.    Correct.

19   Q.    Is that what happened in this case?

20   A.    That is, yes.

21   Q.    Okay.  But that doesn't work, right?  The phone -- it is

22   not able to get into the phone?

23   A.    Right.

24   Q.    But you're still holding the phone when the portion for

25   the keypad pops up?

Cross Examination - Shannon Markel

1    A.    Correct.

2    Q.    And when the keypad pops up on the iPhone, that's an

3    opportunity for someone to enter in their passcode to get into

4    the phone, right?

5    A.    Correct.

6    Q.    And this is, of course, the passcode that you want?

7    A.    Right.

8    Q.    And in order to enter into -- I guess in order to enter

9    the passcode into the phone, most people use their hands, don't

10   they?

11   A.    Yes.

12   Q.    All right.  And so while you're still holding the phone in

13   front of his face, that prompt comes up, and then Mr. Bendann,

14   pursuant to your testimony, enters in the passcode, right?

15   A.    Right.

16   Q.    You didn't say anything at that moment, did you?

17   A.    No.

18   Q.    No.  But, again, previously you had explained to him that

19   you had court authorization to use his hands for certain things

20   while he's there, right?

21   A.    Right, correct.

22   Q.    And you had just put the phone in front of his face

23   without requesting or explaining to him what you were doing,

24   right?

25   A.    Correct.

Cross Examination - Shannon Markel

```
 1    Q.    And so it's not unreasonable for law enforcement to think
 2    that in that context, the suspect might think that they have to
 3    comply and enter in the passcode, right?
 4    A.    Yes.
 5    Q.    Exactly.
 6             MR. NIETO:  Court's indulgence, if I might.
 7             THE COURT:  Yep.
 8    BY MR. NIETO:
 9    Q.    And Corporal, after you -- strike that.
10          When Mr. Bendann answers the passcode, as we talked about,
11    you're still holding the phone, right?
12    A.    Yes.
13    Q.    And so while you're holding the phone, you're able to look
14    and see at what he's entering onto the phone and the keypad?
15    A.    Yes, correct.
16    Q.    But you can't see the whole thing but you see at least the
17    first four digits, right?
18    A.    Correct.
19    Q.    All right.  And so you are endeavoring to determine if
20    that is his birth date, right?
21    A.    Correct.
22    Q.    Because a birth date's a pretty -- you know, that could be
23    used for passwords for phones, right?
24    A.    Sure.
25    Q.    That's not uncommon, is it?
```

Redirect Examination - Shannon Markel

1    A.    It's not uncommon, no.

2    Q.    Right.  And so I think as we've see in the video you

3    direct a question to Mr. Bendann in which you're seeking to

4    confirm that password or that passcode, right?

5    A.    Correct.

6    Q.    And so when he's seated there, sort of offhandedly you

7    turn towards him and you repeat out the numbers, right, 070184?

8    A.    Correct.

9    Q.    And then he confirms that is the passcode, right?

10   A.    Correct.

11   Q.    And that is presumably the same passcode that you had seen

12   him enter into the phone?

13   A.    Correct.

14   Q.    While you were holding it?

15   A.    Yes.

16   Q.    And, of course, this is all subsequent to that initial

17   statement you made to him when you entered that house about how

18   you had court authorization to use his face or hands for

19   certain things, right?

20   A.    Correct.

21            MR. NIETO:  All right.  Thank you, Your Honor.  No

22   further questions.

23            THE COURT:  Redirect?

24                    REDIRECT EXAMINATION

25   BY MS. HAGAN:

Redirect Examination - Shannon Markel

1   Q.    Detective Markel, you were asked about the decision to
2   have the Tactical Unit present and you indicated that they were
3   there because there was a concern of destruction of evidence.
4   Do you recall that testimony?
5   A.    Yes.
6   Q.    Do you recall whether in the affidavit for this particular
7   search warrant you included specific evidence of deletion of
8   evidence?
9             MR. NIETO:  Your Honor, forgive me, I'd like to
10  object.  I think it's outside the scope of my cross.
11            THE COURT:  It is, and the affidavit will speak for
12  itself when it's available.  It's in evidence and available to
13  the Government for argument already.
14       Next question.
15  BY MS. HAGAN:
16  Q.    You were asked about the fact that you showed the sealing
17  order to Mr. Bendann.  Do you recall that?
18  A.    Yes.
19  Q.    But you did not show him the search warrant affidavit that
20  explained the use of biometrics; is that right?
21  A.    That's correct.
22  Q.    And why did you not show Mr. Bendann the actual search
23  warrant affidavit?
24  A.    Because it was sealed and we didn't want pertinent facts
25  of the case to be out at this time.  It was still under

1    investigation.

2    Q.    Are you familiar or had you used prior to the search

3    warrant execution the use of facial recognition biometrics to

4    open a cell phone?

5    A.    Yes.

6    Q.    How does one physically obtain facial recognition

7    biometrics to open a cell phone?

8    A.    By presenting the device to the person who I guess owns

9    the phone, presenting the device to their face.

10    Q.    And to your knowledge is that the only way to trigger the

11    facial recognition?

12    A.    To my knowledge, yes.

13    Q.    And in the clip that was played, four minutes into the

14    body-worn camera footage when you say out loud, "We might need

15    him for certain devices," who were you speaking with?

16    A.    I was speaking with the patrol officer on scene.

17    Q.    And then at some point did you also relay that information

18    to Mr. Bendann?

19    A.    Yes, I did.

20          MS. HAGAN:    Okay.  Nothing further, Your Honor.

21          THE COURT:    May the witness be excused?

22          MS. HAGAN:    Yes.

23          THE COURT:    Mr. Nieto, may the witness be excused?

24          MR. NIETO:    Yes.  Yes, Your Honor.

25          THE COURT:    You may be excused.

Direct Examination - Jon Shumway

1          THE WITNESS:  Thank you, Your Honor.

2          MS. HAGAN:   Your Honor, the Government's next witness

3    is Jon Shumway.

4          THE COURT:  Jon Shumway, please come forward.  All

5    the way up here to the witness stand, sir, and stop there and

6    face our clerk.

7          THE CLERK:  Good morning, sir.  Please raise your

8    right hand.

9          (Jon Shumway was duly sworn.)

10          THE CLERK:  Please adjust that microphone and speak

11    directly into it.  If you don't mind stating and spelling your

12    first and last name for the record.

13          THE WITNESS:  My name is --

14          THE COURT:  The microphone's got to be within about

15    two inches of your face, okay?  So sit back in the chair and

16    pull the mic back to you.

17          THE WITNESS:  How's that?

18          THE COURT:  Close but not quite.  A little closer.  A

19    little closer.  Let's try that.  Go ahead.

20          THE WITNESS:  My name is Jon, J-o-n, Shumway,

21    S-h-u-m-w-a-y.

22          THE COURT:  Your witness.

23                         DIRECT EXAMINATION

24    BY MS. HAGAN:

25    Q.   Good morning, Mr. Shumway.

Direct Examination - Jon Shumway

1   A.   Good morning.

2   Q.   Can you tell us where you were employed in January of

3   2023?

4   A.   I was employed by the Federal Bureau of Investigation in

5   Linthicum, Maryland as a computer forensic examiner.

6   Q.   And how long were you a computer forensic examiner with

7   the FBI?

8   A.   Directly for the FBI 15 years.

9   Q.   Okay.  And is that your background, your specialty area?

10  A.   It is, yes.

11  Q.   And as a forensic examiner, what were your primary

12  responsibilities?

13  A.   Along with doing computer and digital media forensics, I

14  would often assist on search scenes for the seizure of digital

15  materials.

16  Q.   Would you mind telling us a little bit about your specific

17  background and training in that area?

18  A.   I've got extensive training through several places:

19  National White Collar Crime Center; IACIS, which is the

20  International Association of Computer Investigative

21  Specialists; I'm Encase certified; I am also FBI CART, which is

22  Computer Analysis Response Team, certified as a senior examiner

23  at that time.

24  Q.   And did you retire from the FBI?

25  A.   Yes, I did, in August of this past year.

Direct Examination - Jon Shumway

```
1    Q.    And are you currently employed?

2    A.    I am.  I work for -- as a contractor for the Department of

3    Defense at the Defense Cyber Crime Center.

4    Q.    And are you working in a similar area?

5    A.    Exactly the same area.

6    Q.    Okay.  Prior to working for the FBI, were you employed in

7    any law enforcement capacity?

8    A.    I was a police officer in the City of Niagara Falls, New

9    York for 24 and a half years.  The last seven and a half of

10   those I was on temporary duty to the FBI at the Regional

11   Computer Forensics Lab in Buffalo.

12   Q.    Mr. Shumway, I'm going to direct your attention to the

13   search warrant execution in this case that occurred at 115

14   Stanmore Road.  Were you present for the execution of that

15   search warrant?

16   A.    Yes, I was.

17   Q.    And what was your role?

18   A.    To assist the agents in the seizure of digital evidence or

19   digital devices.

20   Q.    And where were you located within the residence when the

21   search was taking place?

22   A.    Primarily, until the search scene is secured, as I am not

23   sworn law enforcement, for security purposes I wait outside.

24   Once the scene is secure, we come in and we assist in locating

25   devices.  Primarily in this case I was in the living room of
```

Direct Examination - Jon Shumway

1    the residence.

2    Q.    And when you made entry into the residence, was it at the

3    same time as Baltimore County Police Detective Shannon Markel,

4    do you recall?

5    A.    It was after she got there.

6    Q.    Okay.  And are you familiar with -- or were you familiar

7    with the target of the investigation, Mr. Christopher Bendann?

8    A.    Through the paperwork that I was shown, yes.

9    Q.    And when you entered the residence after it was cleared,

10   do you recall where you saw Mr. Bendann?

11   A.    He was sitting in the kitchen/dining room in the entryway

12   to the living room in a chair facing the living room.

13   Q.    And did you have any direct contact or conversation with

14   Mr. Bendann?

15   A.    Not immediately, no.

16   Q.    Did there come a point in time when a cell phone was

17   recovered and brought to you?

18   A.    Yes.

19   Q.    And can you tell us specifically what you recall

20   happening?

21   A.    It was an iPhone.  I don't recall which model at this

22   point, but it was on and screen-locked.  As it was made -- I

23   was made aware that biometrics were included in the search

24   warrant, and what that means, basically, is either a thumb or a

25   face can be used to unlock the device.  I was handed the device

Direct Examination - Jon Shumway

1    and determined that it was locked.

2    Q.   Who handed you the device?

3    A.   I believe it was Shannon.

4    Q.   And by Shannon, do you mean Detective Markel?

5    A.   Yes, I do.

6    Q.   Do you recall where this exchange occurred, where in the

7    residence?

8    A.   It would have been in the living room.

9    Q.   Okay.  She handed you the device and you noted what about

10   it?

11   A.   That it was locked.  And I walked over to Mr. Bendann and

12   held it up to his face for the biometrics to unlock it.  It did

13   not work, but he entered the code voluntarily for us, and it

14   was opened.

15   Q.   When Detective Markel first handed you the phone, had it

16   been unlocked to your knowledge?

17   A.   It was locked when it was handed to me.

18   Q.   Okay.  And what was your intent -- what were you intending

19   to do once she handed you the phone?

20   A.   You want to do a couple of things.  One is you want to get

21   it into airplane mode so as little of the data will change as

22   possible.  You can prevent nefarious activities happening to

23   the phone once you've disconnected it from networks.  And then

24   you want to, as we didn't know the PIN code, you want to gather

25   as much information at that time as you can about potential PIN

1    codes, so you want to go into the settings area and look at
2    stored passwords.
3    Q.    And were you able --
4              THE COURT:    One moment, Counsel.
5         (Pause in Proceedings.)
6              THE COURT:    You may continue.
7              MS. HAGAN:    Ms. McGuinn, I'm going to ask you to cue
8    Government Exhibit 3 up to approximately 29 minutes and 10
9    seconds into the video.
10        Actually, Your Honor, do we have to have Mr. Shumway step
11   to the jury box so he can see or is it on?
12             THE COURT:    No.  We surprisingly were able to fix it.
13             MS. HAGAN:    Okay.
14        (A video was played in the courtroom.)
15             MS. HAGAN:    Can you pause it, Ms. McGuinn?
16   BY MS. HAGAN:
17   Q.    Mr. Shumway, is that you in the center of the screen?
18   A.    Yes, it is.
19   Q.    And that is the cell phone that Detective Markel handed to
20   you?
21   A.    Yes, it is.
22   Q.    What are you doing right now with the cell phone?
23   A.    At that point, I'm going to settings, passwords.
24   Q.    Okay.  So when she handed it to you, was the phone open so
25   that you could put it in airplane mode and get to the

Direct Examination - Jon Shumway

1    passwords?

2    A.    To correct my previous statement, yes.  But it was not --

3    the passwords was not open; the phone was open.

4    Q.    Okay.  So the phone was open and so what were you

5    permitted to do right at that moment?

6    A.    At that point, I'm permitted to triage it to see if

7    there's anything extremely relevant, put it into airplane mode,

8    and again, as we don't know the PIN code to get in it, one of

9    the first things we do while we still have the biometrics

10   authorization in the warrant is get into the passwords that are

11   stored in it to see if there's hints to it.

12   Q.    Okay.  And so you were able to put it in airplane mode?

13   A.    Yes.

14   Q.    And I'm going to ask Ms. McGuinn to hit play, but what do

15   you recall happening as you were attempting to go into the

16   different applications on the cell phone?

17   A.    At this point the only application I would be going into

18   was the stored passwords, and it would have brought up a screen

19   requiring the biometrics again.

20   Q.    Okay.

21   A.    It will give you a warning that it failed, try again.

22   Q.    Okay.

23   A.    And I would stop at that point, too many tries, and it

24   would fail altogether.  So I believe at that point, we went

25   back to Mr. Bendann to get his face to look at it again.

1              MS. HAGAN:  Okay.  Ms. McGuinn, can you hit play?

2         (Video Resumed.)

3              MS. HAGAN:  Can you pause it, Ms. McGuinn?

4    BY MS. HAGAN:

5    Q.    The portion that we just saw, Mr. Shumway, did you hold

6    the cell phone back up to Mr. Bendann's face?

7    A.    Yes, I did.

8    Q.    And now you're walking away from him after you have placed

9    the phone up to his face?

10   A.    I had placed it up to his face, but for whatever reason,

11   could have been the angle and whatever, it did not unlock the

12   passwords.

13   Q.    And so you then walked away from Mr. Bendann?

14   A.    Because I had the password at that point.

15   Q.    Right now in the video?

16   A.    Yes.

17   Q.    And how did you have the password at that point?

18   A.    Mr. Bendann actually stated without being asked, "why

19   don't you just use my PIN code, it's 070184."

20   Q.    And when did he say that in relation to what we just

21   watched?

22   A.    When I was still standing right in front of him.

23   Q.    So the part that we just watched, you've walked up to

24   Mr. Bendann, you've placed the cell phone up to his face, your

25   testimony is that that factual recognition did not work and it

Direct Examination - Jon Shumway

1   prompted the passcode?

2   A.    Yes.

3   Q.    And at that point, Mr. Bendann said what to you?

4   A.    He said, "Why don't you use my PIN code, it's 070184."

5          MS. HAGAN:   Okay.  Can we hit play, Ms. McGuinn?

6          (Video Resumed.)

7   BY MS. HAGAN:

8   Q.    Who were you looking for right now?

9   A.    I was going back to see the other agents in the kitchen.

10  Q.    Pause, please.

11         And when you walk back into the kitchen, what happened?

12  Who did you see?

13  A.    I don't recall specifically who I saw in the kitchen at

14  that point.

15  Q.    Did you just watch the clip we just played?

16  A.    Yes, but I didn't see who else was in there.

17  Q.    Okay.  Did you see Detective Markel when you went back

18  into the kitchen?

19  A.    She was in there, yes.

20  Q.    Okay.  Tell us what happened that's out of view on this

21  body-worn camera footage.  What happened when you walked back

22  into the kitchen?

23  A.    At that point I would have just advised that I'm going to

24  take it out to my mobile forensics lab and start to do an

25  acquisition of it.

Direct Examination - Jon Shumway

1   Q.   Okay.  And did you hear Detective Markel in the clip we

2   just played call out "070184"?

3   A.   Yes, I did.

4   Q.   And do you recall how that happened?

5   A.   Just for verification.  I can only make an assumption --

6   Q.   Okay.

7   A.   -- that she called it out to make sure that everybody was

8   clear on the PIN code.

9   Q.   Okay.  When you went back into the kitchen, had you

10  already entered that PIN code?

11  A.   Mr. Bendann actually had unlocked it himself and then

12  volunteered the information, so it was unlocked and the

13  passwords was unlocked.

14  Q.   Okay.  I'm going to just go back to --

15            MS. HAGAN:  Ms. McGuinn, I'm going to ask you to play

16  starting at 29 minutes and 10 seconds.

17  BY MS. HAGAN:

18  Q.   Mr. Shumway, I'm going to ask you to watch Mr. Bendann in

19  the background.

20            (Video Resumed.)

21            MS. HAGAN:  If you can pause it, Ms. McGuinn.

22  BY MS. HAGAN:

23  Q.   Mr. Shumway, did you just see the interaction between you

24  and Detective Markel?

25  A.   Yes, I did.

Direct Examination - Jon Shumway

1    Q.    Now, at that point, if we can just go back to when you

2    indicated that the phone was prompting you for the facial

3    recognition again, correct that you walked up to Mr. Bendann

4    and placed it to his face?

5    A.    That is correct.

6    Q.    Okay.  And what happened when you placed it up to his

7    face?

8    A.    It didn't unlock the area I needed it to unlock and he

9    voluntarily recited his passcode and said "Why don't you use my

10   PIN code."

11   Q.    And then did you seek out Detective Markel?

12   A.    Yes, it appears I did.

13   Q.    And did you locate her in the kitchen?

14   A.    Yes.

15   Q.    And what, if anything, did you tell her or ask her?

16   A.    I would have said something about we've got it.  I may

17   have asked if she had heard the PIN code or just so it gets

18   documented.

19   Q.    Okay.

20   A.    But I don't recall specifically what our interaction in

21   the kitchen was at that point.

22   Q.    Okay.  And then were you able to access the phone at that

23   point?

24   A.    Yes.

25             MS. HAGAN:   Okay.  Court's indulgence.

Cross Examination - Jon Shumway

1    Nothing further, Your Honor.

2        THE COURT:  Cross?

3        MR. NIETO:  Yes, Your Honor.

4                CROSS EXAMINATION

5    BY MR. NIETO:

6    Q.    Now, Mr. Shumway, your recollection of this event -- of

7    this event isn't crystal clear, is it?

8    A.    Not every specific incident, no, sir.

9    Q.    And, again, that makes sense because there is over a year

10   ago, right?

11   A.    Right.

12   Q.    So no one can be expected to remember every single detail

13   of something that happened 14 months ago, right?

14   A.    Not every detail, no.

15   Q.    Right.  And you've been participating in search warrants

16   in this similar capacity before and after that, right?

17   A.    Yes.

18   Q.    Right, okay.  So but as best you can recall in terms of

19   what you were sitting outside waiting for the search warrant to

20   be executed at the beginning, do you remember that, sir?

21   A.    Yes, sir.

22   Q.    Okay.  Now, I know it was early in the morning a little

23   bit after five; is that about right?

24   A.    Five or six.  Generally search warrants were after six but

25   I don't recall specifically the time on this one.

Cross Examination - Jon Shumway

1    Q.    And I'm sorry, sir, did you say generally search warrants
2    are executed after six or around six?
3    A.    As a general rule, yes.
4    Q.    Okay.  All right.  So is it light out?
5    A.    I don't believe it was light out at that point.
6    Q.    Okay.  But the neighborhood in which this house was
7    located, right, you were parked in your car sitting on the
8    street?
9    A.    In our mobile forensic van, yes.
10   Q.    And it is a fairly nice neighborhood, right?
11   A.    I didn't pay that close attention to the neighborhood.  I
12   was more focused on what I was going to be doing.
13   Q.    When you're sitting there just waiting, right, while
14   they're breaking in -- or they're going in through the door,
15   you're going to be locking around, right?
16   A.    Not really.
17   Q.    No?
18   A.    No.
19   Q.    Not looking at your surroundings?
20   A.    Sometimes we're not even right there as they're going
21   through the door.  Sometimes we're, you know, a block or two
22   away waiting to pull up.  It's not good practice to be in front
23   of a location if there's going to be an incident.
24   Q.    All right.  So were you a block or two away from the house
25   that was being searched?

Cross Examination - Jon Shumway

1    A.    When entry was made I believe we were, yes.

2    Q.    Okay.  But you don't have any recollection as to the

3    nature of the neighborhood where you were parked?

4    A.    I don't.

5    Q.    Okay.  Well, did you participate in the pre-raid

6    debriefing?  And forgive me, perhaps that's the wrong

7    terminology.  Before the raid, were you -- did you participate

8    in a meeting with other law enforcement to discuss what was

9    going to happen?

10    A.    Yes.

11    Q.    Okay.  And during that meeting, did anybody alert you or

12    the others to say this is a high-crime area?

13    A.    No.

14    Q.    Did anyone say this is a dangerous neighborhood, be on the

15    lookout or be cautious?

16    A.    No.

17    Q.    Nothing like that, right?

18    A.    Not that I recall.

19    Q.    Right.  And that's something you would have recalled,

20    right, because if it's a dangerous neighborhood, you're going

21    to be conscientious of that, right?

22    A.    As a retired police officer, every neighborhood has the

23    potential to be a dangerous neighborhood in any given

24    situation, sir.

25    Q.    Okay.  But for this situation and this neighborhood, you

Cross Examination - Jon Shumway

1   don't have any recollection of any information that indicates

2   that it was a dangerous neighborhood, correct?

3   A.    Correct.

4   Q.    All right.  Now, I think you had previously testified

5   that -- at the beginning of your testimony that you were the

6   individual that put the phone up to Mr. Bendann's face where he

7   entered in his passcode, right?

8   A.    Yes.  And I corrected that, I was not -- the second time I

9   was not but not the first time.

10  Q.    Absolutely, sir.  That was just a mistake, right?

11  A.    It was.

12  Q.    But in your mind you remembered -- you know, when you

13  think about this you remembered putting the phone in front of

14  his face and then him entering the passcode, right?

15  A.    Yeah.  At some point, yes.

16  Q.    But that's not actually what happened with your

17  interactions with him, right?

18  A.    Well, it did.  I did hold it to his face for the passwords

19  or the face, yeah.

20  Q.    Right, but he didn't enter the passcode, did he?

21  A.    Yes, he did.

22  Q.    He did enter the passcode?

23  A.    Yes, and then asked why we don't just use his PIN code.

24  Q.    Oh, so he did enter the passcode in for you?

25  A.    Yes.

Cross Examination - Jon Shumway

1    Q.    And still said afterwards "Why don't you just use my

2    passcode"?

3    A.    Yes.

4    Q.    The one that he just entered in for you?

5    A.    Yes.

6    Q.    All right.  The same one that we see then-Detective Markel

7    confirming to Mr. Bendann, right?

8    A.    Yes.

9    Q.    Okay.  Now, you were aware that this search warrant

10   allowed for biometric capture?

11   A.    Correct.

12   Q.    Right?  And that's not on every warrant, is it?

13   A.    It's on more warrants as more biometrics have become

14   available on devices, yes.

15   Q.    And that's important because it can be difficult to access

16   electronic devices without them, right?

17   A.    Correct.

18                MR. NIETO:  Okay.  Nothing further, Your Honor.

19                THE COURT:  Redirect?

20                MS. HAGAN:  No, Your Honor.

21                THE COURT:  And may the witness be excused?

22                MS. HAGAN:  Yes.

23                MR. NIETO:  Yes, Your Honor.

24                THE COURT:  You're excused, sir.  You may depart.

25                THE WITNESS:  Thank you.

Direct Examination - Patrick Winn

```
1              MS. HAGAN:  Your Honor, the Government's final
2    witness, who is brief, is Patrick Winn.
3              THE COURT:  Please come forward.
4              THE CLERK:  Good afternoon, sir -- or good morning,
5    actually.  Please raise your right hand.
6         (Patrick Winn was duly sworn.)
7              THE CLERK:  Please adjust that microphone so you're
8    speaking directly into it.  If you don't mind stating and
9    spelling your first and last name for the record.
10             THE WITNESS:  My name is Patrick Winn.
11   P-a-t-r-i-c-k, last name is W-i-n-n.
12             THE COURT:  Your witness.
13                        DIRECT EXAMINATION
14   BY MS. HAGAN:
15   Q.   Mr. Winn, how are you employed?
16   A.   I'm a director of special projects at a company called
17   C2Integration.
18   Q.   What type of work do you do for them?
19   A.   Analytical work.
20   Q.   Directing attention to January 2023, where were you
21   employed?
22   A.   I was a Special Agent with the Federal Bureau of
23   Investigation.
24   Q.   And how long were you a Special Agent with the FBI?
25   A.   Approximately 20 years.
```

Direct Examination - Patrick Winn

1   Q.   When did you retire?

2   A.   In January of '24.

3   Q.   Okay.  Mr. Winn, were you present to assist with the

4   execution of a search warrant at 115 Stanmore Road in

5   Baltimore?

6   A.   Yes.

7   Q.   And what was your role during the execution of that search

8   warrant?

9   A.   I was there to assist as needed.  During the search

10  warrant I was asked to stand with the defendant in this case

11  just to provide security to make sure he wasn't to leave and

12  wasn't going to pose any danger or harm to anybody in the

13  search.

14  Q.   And was that your primary role during the search warrant

15  execution was to stand by Mr. Bendann?

16  A.   Yes.

17  Q.   And do you recall where that took place in the residence?

18  A.   It was I think in the dining room, between the dining room

19  and the living room.

20  Q.   And did you communicate at all with Mr. Bendann while

21  standing there for safety reasons?

22  A.   Yes.

23  Q.   And in what way, what type of communication did you have

24  with him?

25  A.   We were there for a significant period of time,

1    approximately an hour or more, so it was small talk.  Nothing

2    of consequence was discussed.  I think we talked about puzzles,

3    we talked about baking and other noninvestigative-related

4    topics.

5    Q.    So nothing pertaining to this case?

6    A.    Correct.

7    Q.    Anything pertaining to his legal rights?

8    A.    No.

9    Q.    Did it remain just as small chitchat-type topics?

10   A.    Yes.

11   Q.    And I'm just going to show you a quick clip of Government

12   Exhibit 3, Mr. Winn.

13            MS. HAGAN:  Ms. McGuinn, can you start playing the

14   body-worn camera footage at Minute 28?

15            (A video was played in the courtroom.)

16            MS. HAGAN:  Ms. McGuinn, can you stop it?

17   BY MS. HAGAN:

18   Q.    Is that you in the background of Government Exhibit 3 on

19   the screen, Mr. Winn?

20   A.    Yes.

21   Q.    And we can see you in your entirety here engaging in

22   conversation.  Did Mr. Bendann also engage back in

23   conversation?

24   A.    Yes, he did.

25   Q.    And were you able to hear or could you tell in the clip

1    that was played what you were talking about with Mr. Bendann?

2    A.    The audio wasn't great but I did hear I said the word

3    "thousand" and I believe to Mr. Bendann's right there was a

4    table and there was some puzzles, so I believe we were talking

5    about puzzles and how many pieces his puzzle had.  At the time

6    I was doing puzzles and I had done some but nothing up to a

7    thousand pieces so we had a conversation about that.

8    Q.    How would you describe your tone during your

9    communications with Mr. Bendann?

10   A.    Calm.

11   Q.    How would you describe his demeanor and tone when he

12   responded in these conversations?

13   A.    Also calm.

14   Q.    Did you make any threats to Mr. Bendann as you stood there

15   guarding him?

16   A.    No.

17   Q.    Did you induce or coerce him in any way as you stood there

18   with him?

19   A.    No.

20              MS. HAGAN:    Nothing further, Your Honor.

21              THE COURT:    Cross?

22              MR. NIETO:    None, Your Honor.

23              THE COURT:    May the witness be excused?

24              MS. HAGAN:    Yes, Your Honor.

25              MR. NIETO:    Yes, Your Honor.

1              THE COURT:  You're excused and you may depart.

2              THE WITNESS:  Thank you.

3              THE COURT:  Thank you.

4              MS. HAGAN:  Your Honor, that concludes the

5    Government's evidence with respect to the particular motion ECF

6    79.

7              THE COURT:  So I'll hear argument on this motion now

8    and then we'll move on to the other motion in due course.

9         Mr. Nieto, let's start with you.

10             MR. NIETO:  And, yes, Your Honor.  We don't have any

11   witness to call for this motion either.

12             THE COURT:  Thank you for clarifying that.

13             MR. NIETO:  Absolutely, Your Honor.  And so

14   respectfully, our --

15             THE COURT:  How many times was your client

16   encountered by law enforcement in reference to putting in the

17   password to open the phone?

18             MR. NIETO:  I believe, Your Honor, based on the

19   testimony today, it was at least two times.

20             THE COURT:  What's the defense position on the first

21   of those two?  When did that happen and where did it happen?

22             MR. NIETO:  So Your Honor, at the time of the

23   execution of the search warrant, obviously Mr. Bendann is

24   Mirandized and not allowed to leave, he invokes his right to

25   remain silent.  Law enforcement locates this electronic device

Motions Hearing 5/9/24

1    upstairs.  As we saw in the testimony and the video, Detective
2    Markel brings the phone down.  That is, I assume, the first
3    reference which Your Honor is referencing?

4              THE COURT:  Well, I want to know what the defendant's
5    position is with respect to this, but your position so far is
6    there were two encounters.

7              MR. NIETO:  Yes, Your Honor.

8              THE COURT:  That were directed at this issue.

9              MR. NIETO:  Yes, Your Honor.

10             THE COURT:  What's the password to open the phone,
11   and we're describing from the defense perspective the first of
12   those incidents.

13             MR. NIETO:  Yes, Your Honor.  And the crux of our
14   issues with regards to this motion is that when then-Detective
15   Markel approached Mr. Bendann, at the very, very beginning she
16   made that statement that said "Pursuant to the search warrant,
17   we're going to need your face and hands at some point to do
18   certain things."

19        A reasonable person in that circumstance, taking the
20   totality of circumstances, would believe that they had a court
21   order that required them to provide that information.  That's
22   why -- that's exactly why the detective relayed that
23   information pursuant to the search warrant we're going to need
24   your face and hands.

25             So when at the first instant when Detective Markel comes

1    again with no precursor or forewarning, the likes of which she

2    had done in relation to the sealment, doesn't explain, doesn't

3    ask, just puts the phone in his face and it doesn't work while

4    it's holding in front of his face, again, under this umbrella,

5    this tint of saying we -- the Court is requiring you to give us

6    your face and your hands.  When it's prompted for the passcode

7    Mr. Bendann, pursuant to the testimony, then enters it in.

8            THE COURT:  And so the defense argument seems to be

9    that the logical inference that a person reasonably draws from

10   the totality of those circumstances is that a court order that

11   says that we may need your face and hands implies more than the

12   mere touching of the phone to transfer information in one's

13   fingerprint onto the screen and instead, or in addition,

14   implies an obligation, court-ordered, to use your digits and to

15   use them in a particular way to convey private information.

16           MR. NIETO:  In essence, yes, Your Honor.  It's our

17   position that the entry of his passcode was not voluntary based

18   on the totality of circumstances.

19           THE COURT:  But that's based on an argument that he

20   reasonably drew the inference from the statement of the

21   detective that you're court ordered to supply to us your face

22   and your fingers that he reasonably inferred and objectively a

23   person would believe they're being told, oh, I've been court

24   ordered to not just touch the phone but to use my fingertips to

25   convey certain information that's private and known only to me.

Motions Hearing 5/9/24

1          MR. NIETO:  Yes, Your Honor.  A reasonable person in

2     those circumstances would have felt that was their obligation.

3          THE COURT:  All right.

4          MR. NIETO:  And again, Your Honor, I understand the

5     Court's question but, again, just in the totality of

6     circumstances here, it was the manner in which this encounter

7     was prefaced.  It was with Detective Markel making that caveat,

8     that explanation to Mr. Bendann, that a reasonable person would

9     have inferred.

10         Now, Your Honor, we know based on the testimony that the

11    hand or the finger that they're referencing is for their finger

12    to be able to enter the phone.

13         THE COURT:  Fingerprint.

14         MR. NIETO:  Fingerprint, yes, Your Honor.  But, of

15    course, that is based on testimony from law enforcement with

16    over, you know, decades of experience.  We're talking about a

17    reasonable person here who's not involved in law enforcement.

18    This is pre-6 a.m., essentially just awoken by 15 people with

19    guns and fatigues searching the house.  Yes, to be sure, they

20    allowed him to put on pants, they took off the flex cuffs while

21    he had FBI agents standing over him.  You're right.  So in that

22    sense, that was not coercive but, Your Honor, in the totality

23    of circumstances, when the detective comes in and says we have

24    a warrant, it's sealed, you don't get to see it, and we're

25    going to need your face and hands and then in a short time

1    later puts the phone in the face very clearly for the purposes

2    of entering the phone.  A reasonable person would have felt

3    that they were required to do that.  So the introduction --

4                THE COURT:  You don't contend that Markel said

5    anything that wasn't true?

6                MR. NIETO:  Correct, Your Honor.  It was not a lie,

7    it was not a misrepresentation.  But the intent behind the

8    statement is relevant in the analysis of what a reasonable

9    person would have inferred or believed based on the totality of

10   everything that was occurring.

11       So I'm not suggesting Detective Markel at that time did

12   anything untoward.  What I'm suggesting is that by having said

13   that, by having to create this comfortable environment and

14   saying a few things not appreciating the significance of what

15   it would have on the listener, that is what makes it

16   involuntary.

17       An officer can approach anyone on the street and have a

18   perfectly fine conversation.  That person is free to leave.  In

19   this situation Mr. Bendann was not.  And if someone says, do

20   you find if I search or can I do this or that, you know, the

21   analysis is whether a reasonable person would have felt they

22   could have said no.

23                THE COURT:  Okay.  So you agree, though, that if

24   Markel lawfully obtained that password in that interaction at

25   that moment, then what happens subsequently is irrelevant.

1          MR. NIETO:  For purposes of the motion, perhaps, Your

2    Honor, for the legal analysis.

3          THE COURT:  Okay.  So to the extent that Markel

4    subsequently engaged in an illegal custodial interrogation of

5    your client specifically asking him if -- whatever it is.

6          MR. NIETO:  070184.

7          THE COURT:  -- 070184, you know, and gets from him an

8    affirmation that, yeah, that's my date of birth, and were the

9    Court to find that that was not simply the solicitation of

10   basic identifying information which a police officer is

11   entitled, arguably, to gather even when a person has asserted

12   Miranda but was instead in the circumstances and context of

13   this case actually interrogation about a matter of substance,

14   the answer to which was incriminating to your client, it

15   wouldn't matter if she -- if the detective lawfully had the

16   information in the first place.

17         MR. NIETO:  If I may, Your Honor.  Yes.  The second

18   birth date that's provided -- there's two issues.  It's the

19   first issue in the previous statement and, yes, as Your Honor

20   identified, he's already invoked, she asked him very

21   specifically what the passcode is, and we would suggest that is

22   a bridge too far.  The surrounding information --

23         THE COURT:  And assuming I agree with that and that

24   that was illegal, the real question is, how does it possibly

25   matter if one concludes that the initial acquisition of the

Motions Hearing 5/9/24

1    information was lawful.

2          MR. NIETO:  And I guess, Your Honor, the

3    communicating factors of this was retired FBI agents' testimony

4    with regards to -- the forensic expert.

5          THE COURT:  Shumway.

6          MR. NIETO:  Yeah, Shumway, who said, you know, he's

7    into the phone based on what Detective Markel had done but

8    cannot access all the other passwords that are saved within the

9    phone.  Cannot do that.  So he then, as faulty as his

10   recollection may be, but as the video supports he then goes in

11   front of Mr. Bendann again to repeat the same process.

12         THE COURT:  Let's imagine that's all illegal.  If

13   Markel had acquired those six digits in the first interaction

14   with your client and that was lawful, aren't we still the same

15   place?  It doesn't matter, it's irrelevant, they already have

16   the information.

17        If you get information, you acquire evidence lawfully and

18   then subsequently, for whatever reason, you conduct a second

19   search or a second interrogation and that's completely unlawful

20   and acquire the same information that you got the first time a

21   few minutes before lawfully, well, it doesn't really matter,

22   right?

23         MR. NIETO:  And I suppose the -- I suppose the issue

24   that we would have would be that the retired FBI agent did not

25   simply enter in 070184.  Still went back to make confirmation

Motions Hearing 5/9/24

1    that that was, in fact, the correct passcode.

2         THE COURT:  Yeah.  So let's assume that they've got

3    faulty memories and at the moment they can't remember, they

4    left it in their notes upstairs, whatever, so now through an

5    unlawful means they seek to confirm or reacquire what they

6    actually already had lawfully.

7         MR. NIETO:  To access a second -- within the phone,

8    all the different passwords for every other count that would be

9    accessed from that phone.

10        THE COURT:  Well, tell me factually, is that

11    significant in the investigation in this case or what's -- my

12    assumption, perhaps incorrect, has been that all that matters

13    in this is 070184.  Once you have that, you have the keys to

14    the kingdom.

15        MR. NIETO:  Yes.  And again, Your Honor,

16    respectfully, it's our position that the first -- when law

17    enforcement first obtains that passcode --

18        THE COURT:  That that was unlawful.

19        MR. NIETO:  Yes, Your Honor.

20        THE COURT:  And for all the reasons that you very

21    capably articulated, Mr. Nieto, as you always do, you do a

22    great job, that's why this is a very productive discussion that

23    you and I are having right now, aren't -- isn't 070184 the keys

24    to the kingdom?  There's nothing else.

25        MR. NIETO:  Yes, Your Honor.

1          THE COURT:  Okay.  So doesn't that ultimately mean,

2   then, that this entire question on this motion turns on the

3   lawfulness of what happened between Markel and your client in

4   the first instance relative to --

5          MR. NIETO:  Yes, Your Honor.

6          THE COURT:  Okay.

7          MR. NIETO:  So for all those reasons we're asking

8   that the motion to suppress be granted.

9          THE COURT:  Thank you.  Let's go to the next motion.

10         MS. MCGUINN:  We're going to the next motion.  Does

11  Your Honor -- the Government go first?

12         THE COURT:  And I understand there's no evidence,

13  there's just going to be argument.

14         MS. MCGUINN:  Right, Your Honor.  I would just ask to

15  introduce Government's -- I guess we have it marked as

16  Government's Exhibit 2, which is the federal warrant.  I know

17  that Your Honor has a copy of that.  We have a copy here as

18  well for purposes of this argument.

19         THE COURT:  Right.  And so the record is clear, we've

20  handled issues relating to the acquisition of the phone and the

21  most basic access to it through the password that the defendant

22  supplied.  Now we're onto the question of the lawfulness of the

23  Government's, what, subsequent complete forensic examination of

24  the phone.  Is that what we're really talking about here,

25  Ms. McGuinn?

1          MS. MCGUINN:  Yes, Your Honor.  And I have marked as

2    Government's Exhibit 4, which is the federal warrant for

3    this -- purposes of this argument.  I believe Your Honor

4    already has a copy, but --

5          THE COURT:  All right.

6          MS. MCGUINN:  -- since we're discussing the

7    affidavits in both warrants, obviously we need both.

8          THE COURT:  And this dispute really just goes to the

9    question of whether or not the affidavit lawfully or

10   effectively under the law authorized the search that was

11   conducted.  Let's hear the Government's side of this.

12         MS. MCGUINN:  Thank you, Your Honor.

13     Your Honor, in the defendant's motion, which is ECF 78,

14   the defendant has argued that there is insufficient probable

15   cause as to the state search warrant, which the Government has

16   introduced already, as well as the federal warrant, which the

17   Government introduces now as Government's Exhibit 4.

18         The affidavits -- I think the argument is threefold.  One,

19   that the affidavits didn't establish probable cause that there

20   was evidence of a crime that could be found on the devices

21   pursuant to the February 3rd, 2023 search warrant of the

22   residence that --

23         THE COURT:  I misspoke a second ago.  Let me clarify.

24         MS. MCGUINN:  Yes.

25         THE COURT:  The attack is on the affidavits in

1      support of both warrants.

2              MS. MCGUINN:  Yes.  Yes, sir.

3              THE COURT:  All right.

4              MS. MCGUINN:  So the first argument is that the

5      affidavit did not support probable cause that evidence of a

6      crime would be found on the devices for the residential

7      warrant, the state warrant from February 3rd of 2023.

8          My understanding of the second allegation is that both

9      affidavits were based on stale information; and lastly, if the

10     Government were to fail on both of those grounds, the defense

11     says Leon doesn't save this either.  There's not a good faith

12     basis for Detective Markel or later Agent Corn to then act on

13     these two signed warrants.  The state warrant was signed by

14     District Court Judge Karen Pilarski and the federal warrant was

15     signed by now-retired Magistrate Judge Beth Gesner.

16         Your Honor, as to the first prong of the defendant's

17     argument, that affidavits did not establish enough probable

18     cause, as Your Honor knows and as we've --

19             THE COURT:  So let's dispense with the term "enough

20     probable cause."

21             MS. MCGUINN:  Yes, sir.

22             THE COURT:  That's not a concept that is actually --

23             MS. MCGUINN:  Sufficient probable cause.

24             THE COURT:  No, no qualifiers at all.  There's either

25     probable cause or there's not.

1     MS. MCGUINN:  Yes, sir.

2     THE COURT:  No adjectives, "enough," "sufficient,"

3  "adequate."  It's just probable cause.  There's either probable

4  cause or there's not probable cause.  Go ahead.

5     MS. MCGUINN:  Yes, sir.  So as the Government has

6  articulated in its response, this Court should give great

7  deference to the issuing judge's findings of probable cause.

8  The evaluation should be done in a commonsense manner and the

9  legal basis under one of the seminal cases, Illinois v. Gates,

10  is that so long as the magistrate judge had substantial basis

11  for concluding that a search warrant would uncover evidence of

12  wrongdoing, the Fourth Amendment requires no more than this.

13     The search to uncover evidence of wrongdoing in this case,

14  first starting with the search warrant of the residence which

15  was issued by the State District Court Judge.  The residential

16  warrant, as I'll call it, indicated that there was enough

17  probable cause to search the residence, ultimately seize the

18  iPhone, which was described by Minor Victim.

19     As you've seen in the affidavit, Minor Victim specifically

20  described it as a black phone in a white case.  Minor Victim

21  also in the affidavit described the sexual assaults that

22  occurred against him and that the defendant had documented

23  these on the iPhone.

24     All of the other information contained in the affidavit

25  combined with that information shows that there's probable

Motions Hearing 5/9/24

1    cause, that there was fair probability that there was

2    contraband that would be found in a particular place.

3         This affidavit is partially based on what would be

4    considered some hearsay evidence by -- on the part of Minor

5    Victim or the including the other minor victim who is not the

6    subject of the indictment.  Minor Victim talked about how he

7    communicated with the defendant via cell phone, through

8    Snapchat, and he described that the defendant literally had

9    access to, at one point, hundreds of videos and thousands of

10   images of he, Minor Victim.

11        Minor Victim actually gave up his own cell phone, which is

12   also contained in the affidavit, including some of the

13   conversations that Your Honor can see in the affidavit where,

14   on December 8th of 2022, less than two months before the search

15   warrant, the defendant is referring to him as "Puppy" and it's

16   clear in the exchange that there is a dominance and control and

17   the defendant is asking for images to be sent to him.

18             THE COURT:  What does the affidavit reveal about what

19   Minor Victim Number 1 said about the time frame during which

20   information was accumulated?

21             MS. MCGUINN:  Yes, Your Honor.  So that sort of goes

22   to the second prong, which is the staleness prong.  The minor

23   victim describes how the defendant and he met while he was in

24   the middle school at Gilman.  He describes that at some point

25   when he was approximately 15 years old -- he was born in March

1   of 2021 [sic] -- so roughly 2016, 2017.

2              THE COURT:  And what's the date of the affidavit?

3              MS. MCGUINN:  The date of the affidavit?

4              THE COURT:  Yeah.

5              MS. MCGUINN:  Itself is February 1st.

6              THE COURT:  Of?

7              MS. MCGUINN:  2023.

8              THE COURT:  So we're talking about a period up to

9   eight years prior.

10             MS. MCGUINN:  Starting, yes, going back that far.

11       Minor Victim, as he's identified in the warrant as Minor

12  Victim 2, he discusses that -- that's what the Government would

13  consider grooming activity began, that it continued through his

14  ending of high school, which was at least September of 2021

15  when he went off to college.

16       The minor victim describes and it's contained in the

17  warrant that even though he attained legal adulthood, the

18  defendant continued to contact him while he was in college and

19  would continue to ask him or demand of him or threaten him to

20  send images to him.

21       More importantly, on particularly as it relates to the

22  residential warrant, on Page 8 of the affidavit, Minor Victim

23  last saw Mr. Bendann, the defendant, in the summer of 2022.  He

24  learned that the defendant had been placed on administrative

25  leave and the defendant contacted him -- and this is

1   particularly important -- that the defendant contacted him and
2   said -- well, first asked if he was, he, Minor Victim, was the
3   one who reported him to the school and then said, "I'm deleting
4   everything," which implies even though it was eight years since
5   the first instances of abuse, here we are eight years later and
6   he's deleting everything, which infers that he still had
7   evidence of this abuse.

8   Moreover, Minor Victim described that the defendant saved
9   these images, had a special folder on his phone where he kept
10  these images of Minor Victim, and both Detective Markel and
11  later Detective Corn -- or, excuse me, Agent Corn, both
12  articulate in their affidavits through their training,
13  knowledge, and experience that collectors of child pornography,
14  producers of child pornography, they're different.  These are
15  different cases than your run-of-the-mill drug case, your
16  run-of-the-mill gun case.

17  They're different because collectors, distributors,
18  producers of child pornography go through a lot of effort,
19  quite frankly, to accumulate that collection.  In the instance
20  of this case, there is a several-year grooming process before
21  the defendant ultimately gets what he wants, which are full
22  naked images of him sexually abusing a child.

23  These are not -- these are prized things.  And so we have
24  under this staleness argument the Government has articulated
25  several cases through not only the Fourth Circuit but other

1    circuits where courts have routinely agreed that child sexual

2    abuse material cases are just different, that sometimes a

3    four-month lapse in time for the Richardson case is okay, and

4    we even have a case in Carroll, which is out of the Seventh

5    Circuit, that a five-year period is permissible.

6         Here, we have evidence that the abuse began possibly eight

7    years prior but continued for several years through the end of

8    middle school and into high school.

9         While the Fourth Amendment requires that the Government

10   have particularity, and that includes as to time, it is clear

11   here from both what Detective Markel and later Agent Corn in

12   the federal warrant that not only is there evidence through

13   what the Minor Victim explained, but there's also evidence

14   through their training, knowledge, and experience and through

15   what the Court's have held routinely that because of the nature

16   of these cases the static and the mobile of child pornography

17   and abuse cases, it does take time to entice, to coerce, to

18   build that trust, the continuing nature takes time to amass

19   those collections and save them, and Agent Corn further argues

20   that there's even an ability to recover deleted videos, which

21   is especially important here where the defendant actually told

22   Minor Victim that's exactly what he was doing, that he was

23   deleting videos.

24        So the fact that Detective Markel and Agent Corn

25   articulate through their affidavits this particularity as to

1    why child sex abuse cases are different.  In this case, again,

2    there are chats from December of 2022, the Minor Victim

3    actually articulates that the last sexual contact was probably

4    as late as September of 2021, which is only 16 months prior to

5    the execution of this particular warrant.

6        Your Honor, lastly, if the Government is not successful on

7    those first two arguments, there is the good faith exception.

8    Per the defendant's motion, they seem to be focused mostly on

9    the fact that -- quoting their motion -- that both Judge

10   Pilarski and Magistrate Judge Gesner were acting as a rubber

11   stamp in this particular case.

12       In this situation, it's clear when you look at the

13   affidavits that both judges had ample information before them

14   to review and decide probable cause existed.  There are only

15   four situations where reliance on a search warrant would be

16   unreasonable, as we know from Leon, one, that the magistrate

17   for some reason was misled by the information in the affidavit

18   that the officer or in this case the officer and the agent knew

19   was false or in reckless disregard of the truth, that a

20   Magistrate wholly abandoned the detached and neutral judicial

21   role, which is, I believe, what the defense has articulated by

22   saying these two judges were acting as rubber stamps, that the

23   warrants themselves were so lacking in probable cause that it

24   rendered any belief or relying on them as unreasonable by the

25   officers, or that they were so facially deficient by failing to

1    particularize places or things to be searched and seized that

2    they can't be valid.

3         It's clear here that the two judges were not acting as

4    rubber stamps.  The affidavits essentially had probable cause

5    for the home of the defendant, ultimately his electronic

6    devices, and then moving on to the federal warrant, not only to

7    do the devices themselves but the accounts that were also asked

8    to be searched.

9         The rubber stamp argument, Your Honor, is basically a

10   reprisal of the first argument, which is that the affidavits

11   themselves were deficient.  In this case, the Government argues

12   based on Government's Exhibit 4, and I believe it was marked as

13   Government's Exhibit 1, which was the state warrant, that the

14   affidavits are in the record, that they speak for themselves

15   and certainly they contain probable cause such that Judge

16   Pilarski and Judge Gesner signed those warrants and the agents

17   and the officers relied on them appropriately.

18        Unless there are any other questions, Your Honor, I'll

19   submit.

20             THE COURT:  Thank you.  Mr. Nieto?

21             MR. NIETO:  Yes.  Thank you, Your Honor.

22        And again, Your Honor, I know the Court has reviewed the

23   warrants, but just for purposes of keeping the record as clean

24   as I can.

25        Your Honor, the Baltimore County Police were contacted in

Motions Hearing 5/9/24

1    January of 2023 regarding an allegation that Mr. Bendann was

2    providing alcohol to students.  Not in January of 2023 but

3    rather in July and August of 2021, which was almost two years

4    prior, there were no allegations or suggestions or photo or

5    video recording of those incidents.

6        As the investigation develops, a complaining witness tells

7    police about the abuse or this relationship that he allegedly

8    has with Mr. Bendann from 2016 to 2019.  And I say that, Your

9    Honor, because the complaining witness, as the Government

10   acknowledged based on his date of birth, turned 18 in 2019.  So

11   the conduct at issue in this warrant would have allegedly

12   occurred almost four to seven or eight years prior to obtaining

13   this search warrant.

14       On February 1st, 2023, the State Police or state law

15   enforcement get the search warrant for Mr. Bendann's house car

16   and person.  About a week later on the 9th, the federal agents

17   get another search warrant for the same items, as well as

18   Google, Snapchat, Instagram, and Apple accounts.

19       The affidavits in support of those warrants generally

20   parallel themselves.  There might be the inclusion or deletion

21   of a few minor points, but I would submit to the Court that the

22   information in those two affidavits largely reflect each other.

23       Our position on this matter is twofold, respectfully.

24   Number one, there is no probable cause that evidence of a crime

25   as detailed in that warrant would be found on these identified

1    devices or accounts in 2023.

2        Our second issue is, if the Court concludes that probable

3    cause exists for these alleges offenses identified in the

4    warrant, we would respectfully submit that that probable cause

5    is stale simply based on the antiquity of the allegations

6    because, again, nothing currently ongoing to suggest child

7    pornography or sexual exploitation of minors, which is the

8    focus of the search warrant.

9        The Government, I understand it, they argue that these

10   warrants contain sufficient details to establish that evidence

11   would be found on these devices but, again, Your Honor,

12   respectfully, we don't agree.  We believe that --

13       THE COURT:  So indulge me in a hypothetical.

14       A bank is robbed in 2016.  The loot is never recovered.

15   Four years pass.  A person purportedly with knowledge comes

16   forward and says, I know where the loot is, it was stashed four

17   years ago in a particular attic.  There'd be no dispute that,

18   provided the person was otherwise credible, that there's

19   probable cause to believe that evidence of crime is concealed

20   in that attic, even though by the informant's own statement, he

21   or she only knows this based on something that they perceived

22   four years ago.

23       MR. NIETO:  And I --

24       THE COURT:  The mere passage of the four years would

25   say, you can't have a warrant for that attic.  I mean, a lot of

1    things could have happened in four years.  Somebody could have

2    gone up there and found it, they could have taken it, and so

3    forth.

4                MR. NIETO:  And I suppose, Your Honor, based on that

5    hypothetical I would be inquiring for additional information to

6    establish that probable cause.  Because, again, if we're

7    talking about probable cause or staleness they kind of bleed

8    together in my arguments.

9                THE COURT:  Yeah.  Staleness can definitely erode

10    probable cause.

11                MR. NIETO:  And again, Your Honor, staleness in

12    investigations involving child pornography are unique vis-à-vis

13    certain other investigations.  But with respect to your

14    hypothetical, respectfully, Your Honor, I do not believe that

15    there is probable cause for a search warrant when someone,

16    without anything else, simply says I understand after this bank

17    robbery, I know the money is stashed at 123 Fake Street, please

18    go and search it, I think there needs to be more because in the

19    passage of time that is precisely is there probable cause in

20    the day and age in which that warrant is executed.

21                THE COURT:  Okay.  Fair enough.  And so maybe we

22    would have a debate about that in the context of the bank

23    robbery case.  And I'm not going to add any more facts to the

24    hypothetical, but that's sort of a baseline.

25                But in this case there are additional facts, there is the

Motions Hearing 5/9/24

1   information from the experienced agents that set out in the
2   affidavit about how people who engage in this category of
3   offense often behave and the affidavit tells us that they
4   sometimes, in fact, frequently they accumulate their trove of
5   unlawful material and they curate it and it has value to them
6   and they protect it and they secrete it and they certainly
7   don't dispose of it.  And this from people who, according to
8   the affidavit, have a lot of experience conducting
9   investigations in this kind of a case.
10          MR. NIETO:  Yes, Your Honor.  I did see that portion
11   of the affidavit.  And I suppose my response to that would be
12   allegations of child pornography, possession or production is
13   not and should not be a blank check for law enforcement to cash
14   out whenever the mood strikes them.
15      And I'm not suggesting that's what happened here, but
16   inherent in that explicit explanation in the affidavit says we
17   have allegations that the child pornography may have been
18   possessed and since people collect it, it doesn't matter how
19   much time has gone by, it's still viable, it's still probable
20   cause.  And I guess, Your Honor, and in the context of child
21   pornography cases, that's -- that is our issue.
22          THE COURT:  So you may have an issue with respect to
23   an infinite amount of time, but of course the facts of this
24   case aren't an infinite amount of time.  There are a certain
25   number of years.

1          MR. NIETO:  To be sure, Your Honor, yes.  Yes.  But,

2     again, dealing with the specifics in this particular case, if I

3     may -- if I may, Your Honor, the -- and this case is a little

4     bit confusing because, as the Government addressed as a Minor

5     Victim, this complaining witness is no longer a minor, has not

6     been a minor going on five years now.  And so what we see is

7     and including in that affidavit, which I can get into, Your

8     Honor, there's text message threads, there's information about

9     conversations between, allegedly, Mr. Bendann and a 21- or a

10    22-year-old.

11         THE COURT:  That might have been all about -- that

12    interaction itself could be lawful and yet at the same time,

13    though, be powerful evidence of the existence of evidence of

14    things that were not lawful, i.e., similar conduct occurring

15    prior to 2019.

16         MR. NIETO:  Yes, Your Honor.  Absolutely.  But what

17    I'm simply suggesting is that in -- and I don't think this is

18    necessarily contained in the affidavit but I do think it's

19    important to tell the Court is that unlike many child

20    pornography possession and production cases, the relationship

21    between -- the alleged relationship between Mr. Bendann and

22    this complaining witness allegedly begins when the complaining

23    witness is a teenager and continues --

24         THE COURT:  And a minor.

25         MR. NIETO:  Yes, Your Honor.

1      THE COURT:  More important than teenager is minor.

2      MR. NIETO:  The allegations are -- starting when he

3  was 15 or 16, continuing to approximately 21 or 22.  And I

4  guess that's an important distinction to be made because the

5  alleged relationship continues after the complaining witness is

6  already an adult.

7      THE COURT:  Yeah, but when he's 19, 20, 21, and even

8  assuming that whatever he's participating in at that point is

9  completely consensual, it can't render what occurred prior to

10  the 18th birthday lawful.

11      MR. NIETO:  Of course not, Your Honor, but it's

12  included in the affidavit in support that there's probable

13  cause that images of child pornography and exploitation of a

14  minor will be found in 2023 desp -- and again, in support of

15  that is look at the nature of their relationship now.  And I --

16  again, Your Honor, I suggest that's just simply a bridge too

17  far for determining probable -- for the staleness and --

18      THE COURT:  Well, it's not the only thing that's in

19  the affidavit and is it improper that it's in there?  I don't

20  think so.  I think it casts some light on the question of

21  whether there's likely to be evidence of criminal conduct on

22  the phone, i.e., images depicting activity between the two of

23  them prior to the 18th birthday.

24      MR. NIETO:  I suppose, Your Honor, the text thread

25  about which I am referencing, which was referenced in the

1   affidavit in December of 2022, and the complaining witness was

2   almost 22 years old at that point, that's included in there.

3        And I say, Your Honor, again, the classification of the

4   complaining witness as a Minor Victim in December of 2022 can

5   be deceptive.  And I'm not suggesting it was intentional, but

6   what I'm simply suggesting is it creates this image that it's a

7   continuing minor and the fact that, you know, six pages

8   earlier --

9             THE COURT:  But they've been told -- but the judges

10  had been told what the minor person's age was.

11            MR. NIETO:  Yes, Your Honor.

12            THE COURT:  And date of birth.

13            MR. NIETO:  Yes, Your Honor.  As I said --

14            THE COURT:  So presumably the judges can do the math

15  and understand that the evidence of continued familiarity past

16  the age of majority is being submitted to strengthen the

17  suggestion of a relationship that existed prior to majority.

18            MR. NIETO:  And I guess our position, Your Honor, is

19  that, again, respectfully, we don't believe, for example, that

20  particular text conversation moves the needle one way or the

21  other with regards to probable cause.

22       So, Your Honor, if I may --

23            THE COURT:  Yeah.

24            MR. NIETO:  -- both in terms of the first issue is

25  the probable cause of the affidavit and, if I may, Your Honor,

1   just purposes of the record, as I suggested, we have the police

2   being notified about this production of alcohol, some 18 months

3   prior.  They include a conversation or an interview with Victim

4   Number 1 who alleged that Mr. Bendann allegedly allowed him to

5   drink, that was in September of 2021.  So that's approximately

6   16 months prior to that.  And again, of course, the purchasing

7   of alcohol for people, you know, underage or of age or whatever

8   it might be, that doesn't necessarily correlate with the

9   production, the possession of child pornography, nor the sexual

10  exploitation of minors with nothing else.

11      There's of course no photography or videography or

12  anything in that reference with regards to those interactions,

13  nothing to substantiate -- I think there's some allegation,

14  they throw in there the suggestion that Mr. Bendann allegedly

15  had a Ring camera at his house and based on people running

16  around in certain capacities, perhaps that might have been

17  recovered.  Again, Your Honor, there's nothing to substantiate

18  that and, again, I don't believe that is a factor for the

19  probable cause determination.

20      But more importantly, then, they have about four days

21  later on January 30th of 2023, that is Victim Number 2, which

22  is the complaining witness who turned 18 in 2019, almost four

23  years before this interview.  In this affidavit, they detail

24  out the relationship and, in fact, indicate the last time they

25  had seen each other was in the summer of 2022.  Allegations of

1    photographs, but there's of course no clarification in the

2    affidavit as to the timeline on that.  And that's where it

3    becomes incredibly frustrating because, again, as the Court

4    knows, the child pornography possession, production, or sexual

5    exploitation of a minor would have had to have occurred prior

6    to 2019.

7         This affidavit includes in this complaining witness's

8    statement to the police conduct that occurred thereafter, and

9    there's no clarification in that affidavit to provide Judge

10   Gesner or Judge Pilarski any clarification as to whether

11   they're talking about stuff that happened when the complaining

12   witness was a minor or as their relationship continued to

13   develop, you know, into his adult age.  There's nothing to

14   suggest it was before or after the complaining witness was 18.

15        And of course, you know, naturally, the affidavit fails to

16   account for the fact that the complaining witness was, in fact,

17   held back a year in either middle school or high school.  So

18   when they continue to reference the year of high school, 10th

19   grade, 11th grade, I think the Court can take judicial notice

20   for the most part people turn 18 in their senior year.  This

21   complaining witness was held back a year, so he was older.  So

22   he turned 18 in his junior year which, again, is not made clear

23   and muddies the water as to whether these conversations, these

24   photographs or these allegations occurred pre 2019 or post

25   2019.

Motions Hearing 5/9/24

1        So Your Honor, again, on the four corners of the document,

2    it is our position that there is no probable cause to support

3    the searches of these items in 2023 when the warrant is

4    executed.

5        As argument 1(b) in that, that is the staleness argument,

6    Your Honor.  Again, it sort of bleeds together because if the

7    Court finds probable cause existed, we're simply suggesting

8    that probable cause is stale.  The staleness argument in these

9    types of cases, as I suggest to the Court, is different because

10   I believe it depends on a preliminary finding that the suspect,

11   or in this particular case Mr. Bendann, was the person who was

12   interested in those types of things, right?  There has to be

13   circumstances to suggest that he had not only access to images

14   willfully and deliberately, but had sought them out for a

15   preexisting predilection, that he was specifically interested

16   in that.

17       And that's where I think the issues can become confused

18   because since 2019, whatever pictures, videos, anything that

19   was provided, it has nothing to do with child pornography.  It

20   has nothing to do or nothing to support a preexisting

21   predilection for that type of imagery.  In fact, I'll be

22   candid, Your Honor, it's a little bit unclear as to exactly how

23   this relationship truly starts.  You can see in the affidavit

24   an evolution of that relationship, but it seems to be things

25   go, I think as the complaining witness indicated, that things

Motions Hearing 5/9/24

1    got progressively worse, it seemed to be upon the graduation

2    from high school and when he was in college.  That is not and

3    has nothing to do with the child pornography statutes and,

4    again, it's -- I think separates this from some of the other

5    cases in which the Court may find.

6          So with all that being said, Your Honor, we respectfully

7    submit that there's insufficient evidence to support probable

8    cause and if the Court concluded there was probable cause we

9    would respectfully submit that that is stale based on the

10   timing of the execution of that search warrant.

11             THE COURT:  Thank you, Mr. Nieto.

12             MR. NIETO:  Thank you.

13             THE COURT:  There are no other motions pending

14   correct, Mr. Nieto?

15             MR. NIETO:  Correct, Your Honor.

16             THE COURT:  I think there's a motion to -- for

17   permission to file more motions or something to that effect,

18   but we'll put that aside.  Nothing else substantively.

19             MR. NIETO:  Correct.  And I filed that

20   prophylactically, Your Honor, in case something comes up.

21             THE COURT:  Yeas.  So the Court's ready to rule.

22   I'll elaborate on my rulings in a written opinion.

23          Both motions will be denied, first with respect to the

24   adequacy of the affidavits in support of the warrants and the

25   staleness issue.  The suppression of the evidence in this case

Motions Hearing 5/9/24

1    is not warranted because of Leon at least.  We haven't crossed

2    the boundaries that Leon sets.  I don't think we've got

3    difficulties or problems with these warrants regardless, but

4    even if we did, they're not on the scale of Leon.

5        With respect to the body of the affidavits themselves, I

6    find that probable cause to believe that evidence of crime

7    would be uncovered was amply demonstrated to each of these

8    judicial officers in the issuance of the warrants were correct.

9        As to staleness, the Court will elaborate slightly in its

10   written ruling but it has everything to do with the nature of

11   the alleged offense and the circumstances that prevail in these

12   kinds of cases where people who commit these sorts of offenses

13   typically do retain and store their trove of images and that

14   militates against any conclusion of staleness here.

15       With respect to the acquisition of the passcode to gain

16   access to the Smartphone, as was probably implied by the

17   questions that I put to counsel and the discussion that we had

18   previously, for the Court it all hinges on Detective Markel's

19   initial acquisition of that code.  And, while the circumstances

20   are somewhat concerning, the reality in this legal space is

21   that investigating officers and agents are allowed to go up to

22   the line.  They're allowed to go to the edge.

23       The problem arises when they step over the line or they

24   step off the edge, and I find that then-Detective Markel didn't

25   cross lines and didn't step off the edge.  I find that the

Motions Hearing 5/9/24

1    phone was placed in front of the defendant, that, yes, the

2    statements that Mr. Nieto focuses on had been made previously

3    about access to his face and his hands.  All of that had

4    occurred, but Detective Markel didn't take a step beyond that

5    and specifically direct Mr. Bendann to supply the critical

6    information.

7        Bendann may have for his own reasons subjectively inferred

8    that he should supply this information at this point.  I don't

9    know what his exact motivation was, but the conduct of the

10   officer I find was not objectively calculated to elicit that

11   information in circumstances when the officer was otherwise not

12   entitled to do so.

13       Everything that the officer said was true and accurate,

14   the defense concedes as much, and the defendant perhaps

15   reflexively -- I don't know the reason -- supplied the

16   information and it was voluntary.  And once that had been

17   voluntarily provided by the defendant, then law enforcement was

18   entitled to use that information as they subsequently did.

19       As I indicated, I'll elaborate in a written opinion on the

20   reasons for the denial of both motions.  I'll see counsel at

21   the bench.

22       We're off the record.

23       The defendant's remanded to the custody of the Marshal.

24   Court's in recess.

25       (The proceedings concluded at 12:41 p.m.)

Motions Hearing 5/9/24

1    CERTIFICATE OF OFFICIAL REPORTER

2         I, Amanda L. Longmore, Registered Professional Reporter
     and Federal Certified Realtime Reporter, in and for the United
3    States District Court for the District of Maryland, do hereby
     certify, pursuant to 28 U.S.C. § 753, that the foregoing is a
4    true and correct transcript of the stenographically-reported
     proceedings held in the above-entitled matter and that the
5    transcript page format is in conformance with the regulations
     of the Judicial Conference of the United States.

6
                      Dated this 22nd day of March 2025
7                       -S-

8                     _____
                      AMANDA L. LONGMORE, RPR, FCRR
                      FEDERAL OFFICIAL COURT REPORTER
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25